### The UNITED STATES

v.

### Barry E. MILLER, Defendant.

### No. 76–CR–736.

United States District Court,
E. D. New York.

April 26, 1977.

David G. Trager, U. S. Atty., E.D.N.Y., Brooklyn, N.Y. by Marilyn Gainey, Asst. U. S. Atty., for the United States.

William Spanakos, Brooklyn, N.Y., for defendant.

COSTANTINO, District Judge.

On November 3, 1976, Barry Miller was arrested by F.B.I. agents in connection with the interstate movement of certain stolen antique oriental rugs. On that date, as well as the next day, he made various statements to the F.B.I. Subsequently, on November 22, 1976, a grand jury indicted Miller, charging him with violations of 18 U.S.C. § 2314 and 18 U.S.C. § 371. Miller now seeks to suppress the statements made to the F.B.I. on the grounds that (1) his statements were obtained in violation of his Fifth Amendment right against self-incrimination, and (2) that he did not waive his Sixth Amendment right to counsel.

After holding a suppression hearing, the court makes the following findings of fact:

(1) Barry Miller is a nervous, easily upset individual with a high sense of family involvement.

(2) Miller suffers from back problems. At 12 o'clock the night before his arrest he had taken 2 Tylenol with codeine pills; he took 2 more along with a valium at 5:00 a. m. (approximately 2½ hours before his arrest).

(3) At 7:45 a. m. on November 3, two F.B.I. agents—McGoey and Mahaffey— woke up Miller, informed him that he was under arrest and advised him of his rights in accordance with *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

(4) At that time, as a result of his medication and sleepiness Miller was not completely alert.[1]

(5) Miller's wife immediately contacted attorney William Spanakos who had represented Miller in a state court proceeding and informed Spanakos of the arrest.

(6) Spanakos then spoke with Agent McGoey, advised the agent that he (Spanakos) was Miller's attorney, and instructed McGoey not to question Miller.

(7) McGoey advised Spanakos that Miller would be taken to F.B.I. Headquarters in Manhattan for processing after which he would be arraigned in the Eastern District.

(8) Spanakos then contacted Case Agent Charles Boling at F.B.I. Headquarters, advising Boling that he (Spanakos) was Miller's attorney and requested that Boling not question Miller. Boling replied that Miller would be processed and that if Miller "wanted to make a statement, I would be more than willing to listen." (Tr. 1.26).

(9) In the meantime, Miller had gotten dressed and Agents McGoey and Mahaffey escorted him into a car for transportation to F.B.I. Headquarters. In the car Miller was given an advice of rights form which he read at approximately 8:25 a. m. Although he understood the rights themselves, it is not clear whether he understood the waiver provision and he refused to sign the form.

(10) At that time Miller stated that he did not want to talk until he spoke with his attorney (Tr. 1.13)

(11) During the trip to F.B.I. Headquarters one of the agents expressed to Miller the agent's view that Miller had a nice wife and family and indicated to Miller his surprise that Miller would get involved in trouble. This type of comment continued throughout the fingerprinting process.

(12) Later at F.B.I. Headquarters, Miller was advised that if he cooperated, his cooperation would be made known to the United States Attorney, who would in turn bring it to the attention of the Judge, resulting in a low bond (or a personal recognizance bond) which would ultimately enable Miller to return to his wife and children.

(13) After processing, at approximately 10–10:20 a. m. Miller was taken into an

---

1. McGoey testified that when they entered the bedroom they "quickly pulled" the covers away from Miller and announced themselves as F.B.I. agents (Tr. 1.8). Miller's reaction, according to McGoey, was like that of "a normal person waking up in the morning; very groggy, slow, tired." (Tr. 1.15) It would not be stretching a phrase to say that Miller had just been subjected to a "rude awakening"; it seems likely that a "normal" person under the same circumstances would have reacted with much greater alacrity and surprise.

interview room for questioning.[2] Three or four F.B.I. agents were present.

(14) In the room Agent Armstrong advised Mr. Miller that "I wanted to talk to him about the violation of interstate transportation of stolen property." (Tr. 1.67)

(15) At various points during the questioning, Miller asked when his attorney would be present and was informed that he would be present during arraignment. (Tr. 2.5, 2.30)

(16) Miller indicated that he was concerned for his family and therefore wished to cooperate. Agent Armstrong refused to permit Miller to talk however until another advice of rights was given. Again Miller refused to sign the waiver of rights form.

(17) Miller then indicated that Spanakos was his attorney. Agent Boling informed Miller that Spanakos had spoken to him (Boling) and requested Boling not to ask any questions. Boling then advised Miller to make his own decision and that the agents would listen to any statements he would give. (Tr. 1.30, 1.69)

(18) Miller was then questioned and confessed to the crime. Miller further indicated that he would furnish information on the next day relating to the address of another suspect.

(19) At some point during the questioning Miller was told that the F.B.I. could furnish him with a new identity if he cooperated.

(20) Throughout the questioning there was a telephone in the room. Miller was never explicitly told that he could call his attorney, although he was never told that he could not do so.

(21) After questioning was completed Miller was brought before the United States Magistrate in accordance with Rule 5, Fed.R.Crim.P.

(22) That night Miller received a call from Agent Armstrong who indicated that if Miller continued to help, the F.B.I. could furnish him with a new identity.

(23) The next day Miller called the F.B.I. and in accordance with the understanding of the previous day, attempted to aid in locating the other suspect.

### Sixth Amendment Rights

Miller argues that his Sixth Amendment right to the assistance of counsel attached at the time of his arrest and was violated by the interrogation in the absence of counsel; the government argues that the right to counsel did not attach until Miller's appearance before the Magistrate.

The recent history of the Sixth Amendment right to counsel indicates that the courts have had great difficulty in determining when the right attaches. The Supreme Court has recently observed that "[t]here has occasionally been a difference of opinion within the Court as to the peripheral scope of this constitutional right." *Brewer v. Williams*, —— U.S. ——, ——, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977).

In *Escobedo v. Illinois*, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964) the Court was faced with an interrogation of an arrestee who had not yet been indicted. The majority indicated that the issue in the case was whether, under the circumstances, the arrestee had been denied his Sixth Amendment right to counsel. 378 U.S. at 479, 84 S.Ct. 1758. The Court held that

> where . . . the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, the suspect has been taken into police custody, the police carry out a process of interrogation that lends itself to eliciting incriminating statements, the suspect has requested and been denied an opportunity to consult with his lawyer, and the police have not effectively warned him of his absolute constitutional right to remain silent, the accused has been denied "the Assistance of Counsel" in violation of the Sixth Amendment to the Constitution . . . and no statement elicited by the police during the interrogation may be used against him at a criminal trial.

378 U.S. at 490–491, 84 S.Ct. at 1765.

After acknowledging that the defendant had not yet been indicted at the time of the

---

**2.** The sequence of events in the interview room cannot be determined exactly.

interrogation, the Court explicitly held that "in the context of this case, that fact should make no difference." 378 U.S. at 485, 84 S.Ct. at 1762.

The Court indicated that the Sixth Amendment right to assistance of counsel attaches at the point when the adversary system begins. This point was defined as the time "when the process shifts from investigatory to accusatory—when its focus is on the accused and its purpose is to elicit a confession". 378 U.S. at 492, 84 S.Ct. at 1766. *Accord Miranda v. Arizona,* 384 U.S. 436, 477, 86 S.Ct. 1602, 16 L.Ed.2d 694; *see also Coleman v. Alabama,* 399 U.S. 1, 16, 90 S.Ct. 1999, 2007, 26 L.Ed.2d 387 (1969) (Douglas, J., concurring):

Custodial interrogation is in practice—here and in other nations—so critical that we would give "criminal prosecutions" as used in the Sixth Amendment a strained and narrow meaning if we held that it did not include that phase.

In *Miranda v. Arizona, supra,* the Court held that the Fifth Amendment right against self-incrimination included a right to counsel.

Later, in deciding that *Escobedo* and *Miranda* should not be applied retroactively, the Supreme Court concluded in retrospect that the prime purpose of those two decisions was to guarantee full effectuation of the privilege against self-incrimination rather than to insure Sixth Amendment protection. *Johnson v. New Jersey,* 384 U.S. 719, 729, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966).

In a case which dealt with the right to counsel at a post-indictment lineup, and which was decided after *Johnson,* however, the Court re-emphasized the Sixth Amendment underpinnings of *Escobedo* and *Miranda* :

Of course, nothing decided or said in the opinions in the cited cases links the right to counsel only to protection of Fifth Amendment rights. Rather those decisions "no more than [reflect] a constitutional principle established as long ago as *Powell v. Alabama* [287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158] . . . ." *Massiah v. United States, supra,* [377 U.S.] at 205, [84 S.Ct. at 1202.] * It is central to that principle that in addition to counsel's presence at trial, the accused is guaranteed that he need not stand alone against the State at any stage of the prosecution, formal or informal, in court or out, where counsel's absence might derogate from the accused's right to a fair trial. The security of that right is as much the aim of the right to counsel as it is of the other guarantees of the Sixth Amendment— the right of the accused to a speedy and public trial by an impartial jury, his right to be informed of the nature and cause of the accusation, and his right to be confronted with the witnesses against him and to have compulsory process for obtaining witnesses in his favor. The presence of counsel at such critical confrontations, as at the trial itself, operates to assure that the accused's interests will be protected consistently with our adversary theory of criminal prosecution. [citations omitted]

*United States v. Wade,* 388 U.S. 218, 226–227, 87 S.Ct. 1926, 1932, 18 L.Ed.2d 1149 (1967).

In refusing to extend the *per se* rule of *Wade* to a pre-indictment identification, the plurality opinion in announcing the judgment of the Court in *Kirby v. Illinois,* 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972)[3], seemed to retreat from the views

---

\* [*Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964)]

**3.** In *Kirby,* four Justices joined in the plurality opinion, four Justices dissented, and Mr. Justice Powell concurred in the result solely on the ground that he "would not extend the *Wade-Gilbert* [*Gilbert v. California,* 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178] *per se* exclusionary rule". 406 U.S. at 691, 92 S.Ct. at 1883

(Powell, J., concurring in the result). There is nothing in Justice Powell's concurrence to suggest that in an appropriate case he would not conclude that the Sixth Amendment right to counsel could attach at a time earlier than the point defined by the plurality. (Indeed it could be argued that based upon the facts in *Kirby,* the adversary system had not commenced even under the *Escobedo* investigatory-accusatory test.)

expressed in Wade as to the point of attachment of Sixth Amendment rights. The opinion noted that with the exception of *Escobedo* "all of those cases have involved points of time at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information or arraignment." 406 U.S. at 689, 92 S.Ct. at 1882.[4] The plurality opinion, relying upon *Johnson v. New Jersey, supra,* thereupon distinguished *Escobedo* as primarily concerned with Fifth Amendment rights. The opinion then indicated that

> (t)he initiation of judicial criminal proceedings is far from a mere formalism. It is the starting point of our whole system of adversary criminal justice. For it is only then that the government has committed itself to prosecute, and only then that the adverse positions of government and defendant have solidified. It is then that a defendant finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law. It is this point, therefore, that marks the commencement of the "criminal prosecutions" to which alone the explicit guarantees of the Sixth Amendment are applicable.

406 U.S. at 689–690, 92 S.Ct. at 1882.

The four dissenting Justices, however, disagreed as to the point at which the adversary system commences. "An arrest evidences the belief of the police that the perpetrator of a crime has been caught." 406 U.S. at 699, 92 S.Ct. at 1887 (Brennan, J., dissenting)

With the exception of Justice Powell's somewhat ambiguous concurrence, the same number of Justices agreed with the reasoning of the dissent as with the reasoning of the plurality. Thus there is some basis for regarding the dissenting opinion as equally persuasive as that of the plurality in terms of the broad outline of Sixth Amendment rights contained in each.

4. *Cf. Brewer v. Williams,* —— U.S. ——, ——, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977), which intimates that this statement may not be exhaustive of the full scope of the Sixth Amendment right to counsel.

5. *Cf.* Judge (later Chief Justice) Burger's statement in *Mathies v. United States,* 126 U.S.App.

In order to determine whether or not Miller's Sixth Amendment right to counsel had attached at the time of questioning, it is necessary to examine the facts "to determine whether the accused required aid in coping with legal problems or assistance in meeting his adversary" and whether the interrogation in this case "constituted a trial-like confrontation, requiring the 'Assistance of Counsel' to preserve the adversary process by compensating for advantages of the prosecuting authorities." *United States v. Ash,* 413 U.S. 300, 313, 314, 93 S.Ct. 2568, 2575–2576, 37 L.Ed.2d 619 (1973). An examination of the facts indicates that there are persuasive reasons for concluding that Miller's Sixth Amendment right to counsel had attached during his interrogation. This court is aware of Judge Friendly's determination in *United States v. Duvall,* 537 F.2d 15, 22 (2d Cir.), *cert. denied,* 426 U.S. 950, 96 S.Ct. 3173, 49 L.Ed.2d 1188 (1976) that there is "no reason in principle why the filing of a complaint should be deemed to give rise to a right to counsel immediately upon arrest pursuant to a warrant." [5] In *Duvall,* however, there was no evidence that defendant had retained counsel at the time of questioning or that prior to answering questions he requested counsel. Thus, this case is vastly different. Here, Miller had retained counsel,[6] he indicated that he wished to consult with counsel prior to answering questions, he repeatedly asked when counsel would be present, and prior to questioning counsel had spoken with two F.B.I. agents, directing them not to speak to his client.

D.C. 98, 374 F.2d 312, 316, n. 3 (1967), *pet. for reh. en banc denied*:

The prospective application of *Miranda* . . plainly will require that such interviews [between the police and an unindicted defendant who had retained counsel] can be conducted only after counsel has been given an opportunity to be present.

6. *Cf. United States v. Springer,* 460 F.2d 1344, 1352 (7th Cir. 1972):

[w]e recognize that there is a higher standard imposed to show waiver of the presence of counsel once counsel has been appointed than before . . . .

■ If Miller had a Sixth Amendment right to counsel during the interrogation that right could nevertheless be waived.

■ Although the United States Court of Appeals for the 10th Circuit has adopted a *per se* exclusionary rule of statements made outside of counsel's presence unless counsel participates in the waiver, *United States v. Thomas*, 474 F.2d 110 (10th Cir.), *cert. denied*, 412 U.S. 932, 93 S.Ct. 2758, 37 L.Ed.2d 160 (1973) the test in the Second Circuit is not as strict.[7] Nevertheless, in order to find a waiver of the right to counsel there must be "such warnings and explanations as would justify a court in permitting a defendant to proceed *pro se* at trial." *United States v. Satterfield*, 417 F.Supp. 293, 296 (S.D.N.Y.), *aff'd*, 558 F.2d 655, (2d Cir. 1976).[8] This includes the requirement that a defendant be made aware of "the dangers and disadvantages of self-representation". *Faretta v. California*, 422 U.S. 806, 835, 95 S.Ct. 2525, 2541, 45 L.Ed.2d 562 (1975). Thus statements which are voluntary under the Fifth Amendment are not necessarily valid when viewed against the higher standard of waiver implicit within the Sixth Amendment, *United States v. Satterfield*, 558 F.2d 655, at 657; *United States v. Massimo*, 432 F.2d 324, 327 (2d Cir. 1970) (Friendly, J., dissenting), *cert.*

*denied*, 400 U.S. 1022, 91 S.Ct. 586, 27 L. Ed.2d 633 (1971).

Viewed in this light it appears unlikely that the government could succeed in demonstrating that Miller waived his Sixth Amendment right to the assistance of counsel.

■ Shortly after Miller's arrest, his wife specifically contacted his attorney. During the ride to F.B.I. Headquarters, Miller indicated that he did not wish to answer questions until he had spoken with his attorney. During the questioning he repeatedly asked when his attorney would be present. There is no evidence that the F.B.I. explained to Miller the disadvantages of proceeding without an attorney; quite to the contrary, Agent Boling indicated to Mr. Spanakos that if Miller wanted to talk, Boling would be perfectly willing to listen. Boling indicated to Miller that Spanakos did not want Miller to be questioned, but added that Miller had a right to make his own decision. A statement to a defendant that his attorney *does not want* him to be questioned, followed by the statement that the defendant had a right to make is own choice, carries with it an implication that the attorney's advice may not be good advice. In any event Boling's brief recital to Miller of the conversation with Spanakos is no substitute

---

**7.** In *United States v. Massiah*, 307 F.2d 62 (2d Cir. 1962), *rev'd on other grounds*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), the United States Court of Appeals for the 2d Circuit refused to apply Canon 9 of the A.B.A. Canons of Ethics to investigators.

**8.** In *Satterfield*, Judge Knapp stressed the different situation faced by an indicted suspect as opposed to a non-indicted suspect:

Prior to indictment—before the prosecution has taken shape—there may be reasons why a suspect might rationally wish to deal with agents without the intervention of counsel. By getting in their good graces and being useful to the government he might be able altogether to avoid indictment or any legal entanglement. No such opportunity is open to him after a grand jury has spoken. At that point he cannot make any arrangement with agents or prosecutor that is not subject to ultimate approval by the court, and counsel is obviously important to advise him on what terms such approval is likely to be forthcoming and how best to obtain it.

417 F.Supp. 296.

The court is not persuaded, however, that the distinction is a viable one. As Judge Knapp has pointed out, a wider variety of options is open to both the defendant and the government prior to indictment than after indictment. It is precisely because of the presence of a wider variety of options that counsel could be so effective prior to indictment. Counsel would be able to restrain (or, in appropriate cases, encourage) defendant's possibly uninformed and unfounded hope that he might avoid legal entanglement altogether by cooperating. Nor is this court persuaded that the requirement of judicial approval for post indictment "arrangements" compels a conclusion that counsel would be more effective or helpful after indictment than before. Indeed after indictment if counsel is able to make a particularly favorable arrangement the court might still disapprove it; this of course could not happen prior to indictment.

for the meaningful assistance of, and consultation with, an attorney contemplated by the Sixth Amendment.[9]

This court need not, however, make a final determination as to whether Miller's Sixth Amendment right had attached, and if so, whether he had waived that right, for it is clear that the statement he gave to the F.B.I. must be suppressed on Fifth Amendment grounds.

### Fifth Amendment

In *Miranda v. Arizona, supra,* the Court found that the right to have counsel present at an interrogation is an indispensible element of the Fifth Amendment privilege against self-incrimination. 384 U.S. at 469, 86 S.Ct. 1602. The Court noted its awareness of the fact that "[e]ven preliminary advice given to the accused by his attorney can be swiftly overcome by the secret interrogation process." 384 U.S. at 470, 86 S.Ct. at 1625. Accordingly it concluded that if the suspect requests an attorney, questioning must cease until the attorney is present. And "[a]t that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning." 384 U.S. at 474, 86 S.Ct. at 1628.

■ If the procedure set forth in *Miranda* is not followed by the police, a defendant's statement may be excluded, even if the statement is voluntary. *Michigan v. Tucker,* 417 U.S. 433, 443, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974); *Michigan v. Mosley,* 423 U.S. 96, 100, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975).[10]

■ It is clear that in the instant case, the F.B.I. failed to observe the dictates of *Miranda.* At 8:25 a. m. in the car Miller indicated that he did not want to answer any questions until he had consulted with his attorney. Less than two hours later Miller was brought into an interrogation room where an F.B.I. agent told Miller that he (the F.B.I. agent) wanted to talk to Miller about violations of the law involving interstate transportation of stolen property. At no time was Miller specifically given the opportunity to speak to his attorney. When Miller repeatedly asked when his attorney would be present[11] he was told he would see him at the arraignment.

The government, however, contends that even if Miller had requested an attorney, his confession was a volunteered statement, not the result of questioning by the agents and therefore admissible. *See, e. g., Cobbs v. Robinson,* 528 F.2d 1331 (2d Cir. 1975), *cert. denied,* 424 U.S. 947, 96 S.Ct. 1419, 47 L.Ed.2d 354 (1976). The evidence does not support this contention. Despite Miller's statement in the car that he did not wish to answer questions until he had consulted with an attorney, the F.B.I. nevertheless brought him into an interrogation room less than two hours later and indicated that they wanted to "talk" to him about the

9. Indeed Miller testified that there was some discussion that a court appointed attorney would be secured if Miller cooperated and that such an attorney might do a better job than Spanakos. If this occurred it would be a clear cut interference with Miller's right to counsel. The court, however, makes no finding whether such a conversation actually took place—the agent testified that the only discussion concerning a court appointed attorney was that contained within the advice of rights.

10. The government contends that although *Michigan v. Mosley* did not discuss the effect of a request for an attorney, the Supreme Court in that case nevertheless indicated that a flexible approach toward *Miranda* should be adopted. This contention is without merit. In *Mosley* the Court dealt with a provision of *Miranda* that was somewhat ambiguous. The Court however explicitly distinguished the type of situation involved here because of the "detailed" procedures set forth in *Miranda* when a request for an attorney is made. 423 U.S. at 96, n.7, 96 S.Ct. 321; see also Justice White's concurring opinion, 423 U.S. at 110, n.29, 96 S.Ct. 321, as well as the dissenting opinion written by Justice Brennan.

11. By asking this question, Miller was once again reasserting his right to an attorney.

Of course any ambiguity as to the timing of the statements and questions should be resolved in Miller's favor since the government bears the burden of proof. *Cf. Williams v. Brewer,* 375 F.Supp. 170, 185 (1974), *aff'd* 509 F.2d 227 (1975), *aff'd sub nom. Brewer v. Williams,* —— U.S. ——, 97 S.Ct. 1232, 51 L.Ed.2d 424 *supra,* (1977).

crime. It was not until after that statement that Miller agreed to talk, after which he responded to the F.B.I.'s questions. In addition, during the interrogation, Miller repeatedly asked about his lawyer. In light of all of these factors, and in accordance with *Miranda v. Arizona, supra,* Miller's statements must be suppressed.

■ There is, in addition, an alternative Fifth Amendment ground upon which Miller's statements must be suppressed. Prior to Miller's processing, his attorney spoke with two F.B.I. agents—McGoey and Boling—and indicated that he did not want them to question Miller. Despite this request, Agent Boling informed Spanakos that if Miller wanted to say anything Boling would listen. To insure that Boling might have something to listen to, Miller was later brought into an interrogation room where, in the presence of three or four F.B.I. agents, he was told that the F.B.I. wanted to "talk" to him about the crime, and was subsequently questioned. Boling did inform Miller of Spanakos' call but then told Miller that he had the right to make his own choice.

These facts are similar to those before the court in *United States ex rel. Magoon v. Reincke,* 304 F.Supp. 1014 (D.Conn.1968), aff'd 416 F.2d 69 (2d Cir. 1969). In *Magoon,* the defendant had been arrested but not yet indicted. He volunteered certain information to the police officer. In the course of the discussion, the defendant requested that his attorney be telephoned. A call was immediately placed and the attorney spoke with both the defendant and the police officer, requesting that the officer refrain from further questioning until the attorney could be present. This request was ignored and further statements were obtained. The district court, relying on *Escobedo v. Illinois, supra,* held that

> [O]nce an attorney representing a suspected felon upon whom investigation has

focused contacts the police officer in whose charge he is held and informs him that he does not want him interrogated further, to admit into evidence statements thereafter obtained from the accused by police interrogation in the absence of counsel violates the defendant's constitutional rights.

304 F.Supp. 1019.[12]

The United States Court of Appeals for the Second Circuit indicated that it "agree[d] with the approach adopted by Judge Blumenfeld [in *Magoon*] and affirm[ed] his decision and order, substantially in accord with the opinion filed below . . . ." 416 F.2d at 70; *accord, Taylor v. Elliot,* 458 F.2d 979 (5th Cir. 1972), *reh. and reh. en banc denied,* 458 F.2d 981 (1972); *Clifton v. United States,* 341 F.2d 649 (5th Cir. 1965), *reh. denied* (1965). Therefore, in accordance with *Escobedo* and *Magoon,* the statements made by Miller must be suppressed.

It is so ordered.

---

**12.** It is true that in *Magoon* the attorney specifically indicated that he wanted to be present at questioning. In the instant case there is testimony that the attorney asked that questioning cease, but the F.B.I. agent did not recall whether the attorney also requested to be present. (Tr. 1.53) Miller's rights, however, cannot be diminished based upon such a slender distinction.