**Paul CANNISTRACI, Petitioner,**

v.

**Harold J. SMITH, Warden of Attica Correctional Facility, Respondent.**

**No. 77 Civ. 4954 (RLC).**

United States District Court, S. D. New York.

May 3, 1979.

Paul Cannistraci, pro se.

Robert M. Morgenthau, Dist. Atty., New York County, New York City, for respondent by Brian Rosner, Asst. Dist. Atty., New York City, for respondent.

ROBERT L. CARTER, District Judge.

## OPINION

The petitioner, Paul Cannistraci, has applied to this court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. He is currently serving a term of life imprisonment with a minimum of twenty-five years. This sentence was imposed by the Supreme Court, New York County, after a jury found Cannistraci guilty of murder. Petitioner asserts that three inculpatory statements were improperly admitted at trial in violation of his Fifth and Sixth Amendment rights, and the state now moves to dismiss the petition on three separate grounds. First, it argues that the petitioner's claims are not cognizable in a proceeding for collateral relief brought under the federal habeas corpus statute. Second, the state contends that the statements at issue were properly admitted as evidence at the trial. Finally, it is urged that the admission of the statements, even if erroneous, was harmless error. For the reasons that follow, the state's motion is granted and petitioner's application is dismissed.

### Background [1]

On April 27, 1973, Cannistraci, who was then using the alias "Robert Gasparre", left the Concord Hotel in Monticello, New York where he had been employed very briefly. Cannistraci, together with his friend Eric Egan, took a bus to New York City where they checked into a hotel along with Thomas King, who had also been employed at the Concord. Shortly after the three men had gone to their room, Cannistraci and Egan left the hotel, and five minutes later the desk clerk received a telephone call from

---

1. The factual background provided here is derived from the record in this case, including the transcripts of both the pre-trial suppression hearing and the trial. Specific page references are to the official record, abbreviated hereinafter as "TR."

"one of the men who were in 405."[2] The caller said that because Thomas King was a homosexual and had tried to engage in sex with them, the caller and his companion had tied King up and hit him over the head.

The desk clerk called the police who found Thomas King in the hotel room, dead. His body was seated upright in the bathtub, wearing only a shirt and undershirt. He was bound by a cloth that was wrapped around his throat and tied to a pipe behind his head. An autopsy subsequently revealed that King had died from asphyxiation and that he had been unconscious before he was tied up. He had suffered a blow to the head with a blunt instrument, and his larynx had been crushed. An investigation of the scene uncovered a fingerprint that later proved to be Cannistraci's and a bus ticket that gave the police an important lead by suggesting that the perpetrators had recently left Monticello.

When the investigation had focused on Cannistraci and Egan, Detectives Robert Ginivan and Bernard Boyd were assigned to apprehend petitioner. They intercepted him in the hallway of the Bronx County courthouse where he was waiting to appear in a matter unrelated to the murder of Thomas King. The detectives escorted Cannistraci to a nearby room and told him that he was under arrest for homicide. Detective Ginivan then recited the *Miranda* warnings to Cannistraci and asked if he wanted an attorney. Cannistraci replied, "I have nothing to say."[3]

The detectives then placed Cannistraci in a patrol car in order to take him to their precinct headquarters in Manhattan. Boyd drove while Ginivan sat in the back seat with the suspect. During the ride, Cannistraci asked why the detectives had apprehended him at the courthouse before his case had been called. Detective Ginivan asked, "What's the difference?," and Can-

nistraci replied that he had enlisted a friend to answer the first calendar call for his case so that Cannistraci could see if there was anyone in the courtroom to "pick him up."[4] Petitioner claims that the admission of this statement at trial violated his constitutional rights.

Cannistraci then asked who had turned him in. When Detective Ginivan replied that it had been Eric Egan, Cannistraci said, "I thought so, because there aren't too many people on the street that know my real name."[5] This is the second statement that the petitioner unsuccessfully sought to suppress. The detectives then asked a series of questions to which Cannistraci gave incriminating answers. The trial judge, however, found that these statements resulted from police interrogation after the defendant had invoked his right to silence, and he ruled these further statements inadmissible.[6]

Upon arriving at the precinct headquarters, Cannistraci was again informed of his constitutional rights, this time by Detective Boyd. When asked if he would be willing to answer any questions without an attorney present, Cannistraci replied, "No."[7] Shortly thereafter in a conversation with Detective Boyd, Cannistraci acknowledged having worked in Monticello, but this statement was conceded to be inadmissible in light of the petitioner's stated desire not to be questioned in the absence of an attorney.[8] Cannistraci was then processed in connection with the homicide charge, and while this procedure was taking place, Detective Boyd asked the petitioner if he would be willing to speak with an assistant district attorney. To this Cannistraci replied that he would "cop out" if the prosecutor would agree to give him a three year sentence.[9] This is the third statement that Cannistraci claims was admitted at trial in

2. TR at 253, 263.

3. TR at 55.

4. TR at 10, 46, 58, 288.

5. TR at 50, 58–59.

6. TR at 112, 114–15, 136.

7. TR at 8.

8. TR at 107.

9. TR at 15–16.

violation of his constitutional rights. At the conclusion of petitioner's pretrial *Huntley* hearing,[10] Justice Aloysius J. Melia found that the statements about a stand-in and public ignorance of his identity had been volunteered in conversations that Cannistraci himself had initiated.[11] In addition, the court held that Cannistraci's offer to plead guilty if promised a three-year sentence was admissible, but no explicit reasons were given for this ruling.[12]

At the conclusion of Cannistraci's trial, the jury found that he was not guilty of felony murder. *See* N.Y. Penal Law § 125.-25(3) (McKinney). However, the jury did find him guilty of murder in the second degree for engaging in reckless conduct that caused the death by strangulation of Thomas King.[13] *See* N.Y. Penal Law § 125.25(2) (McKinney).

After his conviction, Cannistraci commenced a direct appeal to the Appellate Division in which his counsel argued that the three incriminating statements at issue were the product of interrogation that was prolonged after Cannistraci had invoked his right to remain silent. The Appellate Division rejected this argument and affirmed the conviction, *People v. Cannistraci*, 54 A.D.2d 631, 387 N.Y.S.2d 399 (1st Dept. 1976), and the Court of Appeals denied leave to appeal. *People v. Cannistraci*, 40 N.Y.2d 1081, 392 N.Y.S.2d 1031, 360 N.E.2d 965 (1976); 41 N.Y.2d 864, 393 N.Y.S.2d 1031, 362 N.E.2d 629 (1977). Cannistraci then filed this *pro se* petition for a writ of habeas corpus.

*Collateral Review of State Court Determinations*

■ The state has argued that the petitioner's claims are not cognizable in a habeas corpus proceeding. This contention is derived from *Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), in which the Supreme Court held:

"[W]here the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Id.* at 482, 96 S.Ct. at 3046 (footnote omitted).

*See also Gates v. Henderson*, 568 F.2d 830 (2d Cir. 1977), *cert. denied*, 434 U.S. 1038, 98 S.Ct. 775, 54 L.Ed.2d 787 (1978). The state now seeks to extend *Stone* to the issues of self-incrimination and right to counsel raised in this case. The Second Circuit has thus far declined to apply *Stone* to violations of the Fifth or Sixth Amendments, *see Wilson v. Henderson*, 584 F.2d 1185, 1189 (2d Cir. 1978), and I am persuaded that the Supreme Court's rationale is apt only where issues of search and seizure alone are involved. However, for a full exploration of this question more space would be needed than is required to dispose of the issues going to the merits. As I am confident that we have jurisdiction and equally satisfied that the petition lacks merit, it seems a somewhat futile exercise in scholarship to address fully the jurisdictional question. Accordingly, I will proceed directly to the merits of the petition.

*Admissibility of Incriminating Statements*

1. *Statements Made During Transit— Fifth Amendment Issues*

■ While he was being transported from the Bronx courthouse where he was arrested to the precinct headquarters, petitioner made two incriminating statements that were admitted at trial: he acknowledged having a stand-in answer the first call of the court calendar so that he could see if anyone were there to apprehend him, and he admitted that few persons were aware of his true identity. I find that Justice Melia's conclusion was correct: these statements were volunteered and therefore admissible.

---

10. *See People v. Huntley*, 15 N.Y.2d 72, 255 N.Y.S.2d 838, 204 N.E.2d 179 (1965).

11. . TR at 110, 114, 134–36.

12. TR at 114, 135.

13. TR at 507.

The Fifth Amendment protects an accused from being compelled to testify against himself. In the absence of compulsion, the exclusionary rules developed to protect the right do not operate. Although in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Court recognized that the inherently coercive atmosphere of police custody could impel an accused to incriminate himself involuntarily, *id.* at 460–61, 86 S.Ct. 1602, it also acknowledged that volunteered statements would continue to be admissible:

> "Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated." *Id.* at 478, 86 S.Ct. at 1630.

Consistent with *Miranda,* numerous cases have held that statements that are not the product of interrogation may be admitted. *See, e. g., Hines v. LaVallee,* 521 F.2d 1109, 1112–13 (2d Cir. 1975), *cert. denied,* 423 U.S. 1090, 96 S.Ct. 884, 47 L.Ed.2d 101 (1976); *United States v. Cook,* 530 F.2d 145, 152 (7th Cir. 1975), *cert. denied,* 426 U.S. 909, 96 S.Ct. 2234, 48 L.Ed.2d 835 (1976); *United States v. Martin,* 511 F.2d 148, 150–51 (8th Cir. 1975); *United States v. Tafoya,* 459 F.2d 424, 427 (10th Cir. 1972).[14]

Here, there is little doubt that the first two incriminating statements made by the petitioner were volunteered. Propelled by curiosity, the accused initiated a conversation with the arresting police officers by asking why they had not waited for him to answer the court's calendar call. The officer's response—"What's the difference?"— is surely in the form of a question, but it can hardly be characterized as interrogation. That the petitioner made an incriminating statement in response to this vague remark is hardly an indication that he was subject to compulsion in even the most minor degree. Similarly, Cannistraci initiated the second colloquy that resulted in his making an incriminating statement. He asked the officers who had informed on him, and, when told, he remarked that the informant was one of the few persons who knew his real name. In this instance, the police officer's comment to which the petitioner responded was not even in the form of the question, and again the incriminating statement was correctly found by the state court judge to have been volunteered.

■ To say that the statements at issue here were volunteered is not, of course, a regression to the voluntariness test that governed the admissibility of all incriminating statements prior to the Supreme Court's decision in *Miranda.*

> "[T]he Court held in that case that unless law enforcement officers give certain specified warnings before questioning a person in custody, and follow certain specified procedures during the course of any subsequent interrogation, any statement made by the person in custody cannot over his objection be admitted in evidence against him as a defendant at trial, even though the statement may in fact be wholly voluntary." *Michigan v. Mosley,* 423 U.S. 96, 99–100, 96 S.Ct. 321, 324–325, 46 L.Ed.2d 313 (1975).

*See also United States v. Miller,* 432 F.Supp. 382, 389 (E.D.N.Y.1977). My conclusion here does not violate this principle because it is not based on a finding that the petitioner voluntarily responded to interrogation.[15] Rather, the first two statements

---

14. These cases are cited to support the general proposition that volunteered statements that are not the product of interrogation may be admitted at trial. Given the circumstances presented in each of these cases I would not necessarily have found that the statements were in fact volunteered.

15. Likewise, this is not a finding that petitioner formally waived his Fifth Amendment rights.

To be adequate, a waiver must be "an intentional relinquishment or abandonment of a known right or privilege." *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). The Supreme Court has noted that this standard was developed specifically to guarantee fair criminal trials, *Schneckloth v. Bustamonte,* 412 U.S. 218, 235, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), and there is no doubt that it applies to both Fifth and Sixth Amend-

in issue were not elicited in violation of the petitioner's Fifth Amendment rights because they were simply not the product of questioning by the police.

### 2. Statement Made at the Precinct House—Sixth Amendment Issues

The petitioner's third statement presents a more difficult problem because it implicates Sixth Amendment rights. Prior to being "booked," the accused had been given his *Miranda* warnings and was asked

whether he would be willing to talk without a lawyer present, to which he answered in the negative. Later, as the processing of the defendant drew to a close, an officer asked Cannistraci if he would be willing to speak to an assistant district attorney. In response to this, the defendant indicated a willingness to plea bargain.

 I find that Cannistraci's right to counsel had attached before he uttered the third incriminating statement.[16] Further-

---

ment rights. *See Brewer v. Williams,* 430 U.S. 387, 404, 97 S.Ct. 1232, 51 L.Ed.2d 423 (1977) (Sixth Amendment); *Michigan v. Mosley,* 423 U.S. 96, 103–04, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975) (Fifth Amendment).

In the instant case the police persisted in questioning the defendant after he had invoked his right to silence and sought the advice of counsel. In the context of the Fifth Amendment, "the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.' " *Michigan v. Mosley, supra,* at 104, 96 S.Ct. at 326. Similarly, a waiver of the right to counsel solicited by police who have failed to honor the accused's request for an attorney is "properly viewed with skepticism." *Michigan v. Mosley, supra,* at 110 n. 2, 96 S.Ct. 321 (White, J., concurring). *See also White v. Finkbeiner,* 570 F.2d 194, 200 (7th Cir. 1978); *Maglio v. Jago,* 580 F.2d 202, 205 (6th Cir. 1978); *United States v. Satterfield,* 558 F.2d 655, 657 (2d Cir. 1976). Here, there has been no showing that after the accused had declined to speak without having an attorney present the police then obtained a knowing and intelligent waiver before persisting in questioning him. Therefore, if the statements admitted into evidence were the product of the alleged violations of the petitioner's rights, he would be entitled to relief.

**16.** The Supreme Court has generally engaged in a functional analysis of whether the "guiding hand of counsel" is necessary to aid the accused. *See Gideon v. Wainwright,* 372 U.S. 335, 344–45, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). For example, in *Escobedo v. Illinois,* 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), the Court held that a suspect had a right to counsel when the investigation had begun to focus on him and he was subjected to custodial interrogation. *Id.* at 490–91, 84 S.Ct. 1758. The fact that the defendant had not been formally indicted held no significance. *Id.* at 485, 84 S.Ct. 1758. Similarly, in *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), the Court found that a pre-trial lineup presented opportunities for prosecuting attorneys to take advantage of the accused, and the right to

counsel was therefore held to attach at such identification procedures. By contrast, the Court recently held that Sixth Amendment rights did not attach where a witness identified the accused from a photograph display. *United States v. Ash,* 413 U.S. 300, 93 S.Ct. 2568, 37 L.Ed.2d 619 (1973). The Court reasoned as follows:

"Since the accused himself is not present at the time of the photographic display . . . ., no possibility arises that the accused might be misled by his lack of familiarity with the law or overpowered by his professional adversary. Similarly, the counsel guarantee would not be used to produce equality in a trial-like adversary confrontation." *Id.* at 317, 93 S.Ct. at 2577.

The Court noted that the right to counsel had traditionally attached in situations where the attorney could "act as a spokesman for, or advisor to, the accused." *Id.* at 312, 93 S.Ct. at 2575. It observed that in *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1974), "counsel could have advised his client on the benefits of the Fifth Amendment and could have sheltered him from the overreaching of the prosecution." 413 U.S. at 312, 93 S.Ct. at 2575. *Compare Robinson v. Zelker,* 468 F.2d 159, 163 (2d Cir. 1972) (issuance of arrest warrant under New York penal law sufficient to activate Sixth Amendment protections) *with United States v. Duvall,* 537 F.2d 15, 20–22 (2d Cir. 1976) (filing of criminal complaint against defendant did not give rise to right to counsel immediately upon arrest).

I am persuaded that these considerations compel a finding that the right to counsel attached in the instant case. When subjected to custodial interrogation following his arrest, petitioner could well have been misled by his ignorance of the law and overborne by his adversary. He surely would have benefitted from professional advice regarding his right to remain silent. Thus, no talismanic significance can be given to the fact that no indictment had yet issued in this case. Petitioner had a functional need for counsel at this adversarial stage lest the provision of counsel at the trial itself be rendered meaningless. *See United States v. Miller,* 432 F.Supp. 382, 386–87 (E.D.N.Y.1977).

more, the record cannot support a finding that petitioner waived his right to counsel before answering.[17] However, the Sixth Amendment is not violated unless the statements in issue are deliberately elicited. See Kamisar, *Brewer v. Williams, Massiah, and Miranda : What is Interrogation? When Does It Matter?,* 67 Geo.L.J. 1, 44, 65 (1978). Thus, the Supreme Court noted in *Brewer v. Williams,* 430 U.S. 387, 400, 97 S.Ct. 1232, 51 L.Ed.2d 423 (1977), that the right to counsel would not have come into play in that case had the defendant not been interrogated. Similarly, the Second Circuit recently concluded in *Wilson v. Henderson, supra,* that the Sixth Amendment rights of a defendant were not violated when an informant was placed in his cell in the hope that the accused would spontaneously reveal the names of other participants in the crime. This decision was supported by the dual determination that the police neither intended to elicit incriminating remarks from the defendant nor instructed the informant to interrogate him. *Id.* at 1190–91.

■ Deliberate elicitation can be demonstrated with either subjective proof of intent on the part of the police or objective proof relating to police conduct. In the instant case, both approaches support a finding that the police did not deliberately elicit Cannistraci's third incriminating statement. First, there is no evidence that Detective Boyd intended his question to result in the defendant making an incriminating statement. There has been no showing, as there was in *Brewer v. Williams, supra,* that the officer was knowingly using subtle psychological ploys to encourage the accused to confess.

■ It would, of course, be unwise to place too great weight on the refusal of a police officer to admit that his questions were designed to pressure a defendant into incriminating himself.[18] Therefore, the court must look to the objective evidence and ask whether the officer's conduct might reasonably have been expected to result in the utterance of an incriminating statement. In the instant case the circumstances compel a negative answer. Detective Boyd simply asked Cannistraci if he wished to speak to an assistant district attorney. Although the accused had previously indicated that he did not wish to be questioned in the absence of an attorney, it now well-established that the police could at some later time determine whether he had changed his mind and was willing to waive his right to counsel. *See Michigan v. Mosley, supra,* 423 U.S. at 100–06, 96 S.Ct. 321; *Wilson v. Henderson, supra,* at 1187; *United States v. Collins,* 462 F.2d 792 (2d Cir. 1972). It may well be that a waiver in this case would have been ineffective because the police solicited it too soon after the defendant had first invoked his rights, thus giving him the impression that his rights would not be fully honored. *See Michigan v. Mosley, supra,* 423 U.S. at 102, 96 S.Ct. at 326; *Wilson v. Henderson, supra,* at 1188–89; Stone, *The Miranda Doctrine in the Burger Court,* 1977 Sup.Ct.Rev. 99, 130, 133, 136. But that issue need not be determined, since in any event the officer's ques-

---

**17.** Because of the seminal importance of the right to counsel, courts have been particularly reluctant to infer that a defendant has lost the right once it has attached. It is true that most courts have rejected a per se rule whereby once the right has attached any statement taken in the absence of counsel would have to be excluded. *See, e. g., Wilson v. Henderson,* 584 F.2d 1185, 1190 (2d Cir. 1978); *United States v. Rodriguez-Gastelum,* 569 F.2d 482, 486 (9th Cir. 1978) (en banc); *United States v. Gaynor,* 472 F.2d 899 (2d Cir. 1973). Nevertheless, the government's burden in showing waiver of Sixth Amendment rights is a particularly heavy one, perhaps heavier than the burden it must carry in showing a waiver of the right against self-incrimination. *See United States v. Satter-*

*field,* 558 F.2d 655, 657 (2d Cir. 1976). No such waiver has been demonstrated here. See note 15, *supra.*

**18.** The police officer's admission in *Brewer v. Williams,* 430 U.S. 387, 399, 97 S.Ct. 1232, 51 L.Ed.2d 423 (1977), that he had specifically intended to obtain incriminating statements by conversing with the accused was sufficient cause to exclude the resulting inculpatory statements from evidence. By contrast, an officer's self-serving statement that he had no intention of eliciting a confession that was obtained in the absence of counsel should carry little weight.

tion itself was not improper. It merely called for a yes or no answer. When the accused responded by expressing a willingness to plea bargain, he volunteered information that the question itself could not reasonably have been expected to elicit. Therefore, the defendant's incriminating statement was not the product of any violation of his Sixth Amendment rights.[19]

*Conclusion*

Thus, the statements in issue were not the product of police interrogation, and therefore the petitioner's Fifth Amendment rights were not violated. Similarly, the statements were not deliberately elicited in violation of Cannistraci's Sixth Amendment rights. Rather, all of the statements were volunteered and therefore were properly admitted at trial.

The state's motion is granted and the petition is dismissed.

IT IS SO ORDERED.

**19.** Of course, admission of this third statement at trial did not constitute a violation of petitioner's Fifth Amendment rights either, since it was not the product of interrogation.