UNITED STATES of America

v.

Joseph GAZZARA, Edward Stanard, Joseph Bohn, Robert Stanard, and Samuel Cazes, a/k/a "Sonny," Defendants.

No. 83 Cr. 406 (ADS).

United States District Court,
S.D. New York.

May 22, 1984.

**314**

Rudolph W. Giuliani, U.S. Atty., S.D. N.Y., New York City, for United States of America; Aaron R. Marcu, New York City, of counsel.

Hochheiser & Aronson, New York City, for defendant Edward Stanard; Lawrence Hochheiser, Kenneth J. Aronson, New York City, of counsel.

McCormack & Damiani, Bardonia, N.Y., for defendant Gazzara; Gerard M. Damiani, Bardonia, N.Y., of counsel.

Lawrence F. Ruggiero, New York City, for defendant Joseph Bohn.

Julia P. Heit, New York City, for defendant Robert Stanard.

## OPINION AND ORDER

SOFAER, District Judge:

Defendants in this case are charged with conspiring to deal in counterfeit obligations and with possession of counterfeit plates in violation of 18 U.S.C. §§ 37, 474 & 2. Their arrests and indictments grew out of a counterfeiting investigation by Special Agents of the Secret Service. In April 1983 counterfeit currency began appearing around Rockland County, New York. The counterfeiters apparently had some difficulty producing a convincing product, however, since on April 17 police found a barrel containing millions of dollars of discarded, imperfect counterfeit bills floating in the Hudson River near Stony Point, New York. The government intends to show that the conspirators decided in May to get out of the counterfeiting business and that Joseph Bohn, acting as a middleman, arranged for an individual whom he knew only as "Leo" to buy the machinery and materials used in the counterfeiting operation from a man named "Ed" for $150,000. Before agreeing to purchase the materials, "Leo" requested samples of the product, and "Ed" —via middleman Bohn—supplied counterfeit bills in several denominations for the buyer's approval. Unknown to Bohn, the Secret Service had earlier traced suspect bills to Bohn's butcher shop, Charlie's Meats, in Nanuet, New York, and had initiated an undercover operation to crack the conspiracy. Bohn's buyer "Leo" was Secret Service Agent Letterio D'Amico.

On May 19, 1983, D'Amico and another agent, wired with a transmitter enabling a Secret Service surveillance team to monitor the transaction, went to Charlie's Meats on Main Street, Nanuet, to consummate the purchase. Having verified that the promised plates and equipment were in the butcher shop basement, the agents arrested Bohn, as well as Edward Stanard and Joseph Gazzara, two men alleged to be Bohn's confederates who were apprehended at or near the scene of the transaction. The three were indicted June 20, 1983, and on July 29 a grand jury voted a superseding six-count indictment naming these three and Edward Stanard's brother Robert, as well as Samuel Cazes, who subsequently entered a guilty plea.

Each of the four remaining defendants has filed motions to suppress statements and/or evidence obtained at the time of his arrest and in the ensuing investigation, claiming violations of the Fourth, Fifth and Sixth Amendments. Defendant Gazzara moved to suppress his post-arrest statements and evidence seized pursuant to a search warrant issued after his arrest, arguing that the arrest was made without probable cause and that the search warrant was based on "fruits" of the illegal arrest. Gazzara also sought to suppress a witness identification based on a photographic array he contends was impermissibly suggestive. Defendant Bohn moved to suppress admissions made to Secret Service agents on the ground that he was unaware of his rights and was given no *Miranda* warn-

ings. He moved as well to suppress evidence obtained after a warrantless search of his home which he claims took place without his consent. Robert Stanard moved to suppress evidence acquired in the warrantless search of a room he used in a friend's home on the ground that the search violated the Fourth Amendment because it was accomplished without his consent or the consent of the home's owner. He sought also to suppress two pretrial identifications based on essentially the same photographic array challenged by Gazzara. Edward Stanard moved to suppress his post-arrest statements on the ground that they were taken in violation of his Fifth and Sixth Amendment rights, after he had invoked his right to an attorney.

After seven days of evidentiary hearings and an opportunity for complete briefing on the issues, the suppression motions were deemed fully submitted as of March 25, 1984. Defendants have also moved for severances under Rule 14 of the Federal Rules of Criminal Procedure on the ground that introduction into evidence of the unredacted inculpatory admissions of their codefendants would violate their rights to confront their accusers under *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

## I. *Joseph Gazzara*

On the morning of May 19, while the scheduled sale of the printing .equipment and plates was taking place behind Bohn's butcher shop, several Secret Service agents were deployed in visual and electronic surveillance of the neighborhood around the shop. One of their specific objectives was to watch for anticipated "counter-surveillance" by Bohn's accomplices. Agent Bodigheimer supervised the surveillance from a specially equipped electronic surveillance van parked up the block from Charlie's Meats. As the action unfolded, he monitored the undercover agents' conversations with Bohn via a transmitter carried by one of the agents and radioed a play-by-play account to the teams of agents dispersed around the town of Nanuet.

At about 10:30 a.m. Agent Boklan, who had been assigned to watch the rear of the shop, drove past the shop's exit and across Orchard Street, and took up a position from which he could observe the exit of the parking lot behind Charlie's Meats. At about 10:35 a.m. Boklan's attention was drawn to a car parked nearby on Orchard Street also in a position to observe the parking lot exit. Boklan saw a person in the car reading a newspaper. He watched the person lower the paper and look around, and at that point recognized him as Joseph Gazzara, a suspect whose photograph he had obtained earlier in verifying an informant's tip. He also recognized the license plate as Gazzara's. He alerted the other agents to Gazzara's presence on the scene.

Shortly after 10:35, immediately after Agent Boklan made eye contact with him, Gazzara pulled out of his parking space and drove to an autobody shop down Orchard street, from which Charlie's Meats was still visible. Agent Boklan followed by car and observed Gazzara conversing with an employee but also appearing to "look around." Boklan drove by the autobody shop and continued down the road. He then returned to his surveillance post behind Charlie's, and noted at about 10:44 that Gazzara had left the autobody shop. Meanwhile, Agents Rohde, Lacey, and Adams, stationed at various points around Nanuet, were reporting Gazzara's movements. They observed Gazzara drive east on Church Street, away from Charlie's Meats, turn north on Demarest, a residential street, take a right hand turn into the dead end of Orchard, back up and turn south on Highview, another residential street, and turn west on Church. He appeared to turn south on Main Street, away from Charlie's, before he was lost from view. Within minutes he reappeared, coming down Main Street from the opposite direction. He passed over an empty parking space in front of Charlie's and parked three to five car lengths beyond the butcher shop. At approximately 10:45 Agent Bodigheimer radioed the other agents that Gazzara was parked on Main Street, seven-

ty-five feet beyond Charlie's Meats, in a position to watch the front entrance to the butcher shop parking lot.

At about this time Agent Bodigheimer overheard and radioed to the agents Bohn's statement that an armed confederate was parked in a van behind the shop and another confederate was "out there" waiting to collect the genuine currency in exchange for the equipment. At about 11:05 Agent D'Amico, who was posing as "Leo," left Charlie's Meats, walked out the front exit of the parking lot to a public phone booth on the corner of Church and Main Streets and telephoned the Secret Service's New York field office in the World Trade Center to report that the equipment had been delivered to the shop—the signal to close in for the arrests. He repeated Bohn's statement that Bohn had two partners, an armed man out back in a van and another man out front. This information was immediately relayed by radio to the agents at the scene.

As D'Amico returned to the butcher shop he walked past Gazzara's car. D'Amico testified, corroborated by Bodigheimer, that he and Gazzara made eye contact as he passed. Shortly after D'Amico reentered the shop Gazzara, who had been parked on Main Street for some twenty minutes without exiting his car, pulled away from the curb and drove off. He was arrested approximately three quarters of a mile from the market. Advised of his rights, he acknowledged that he understood them and agreed to talk to the agents. But he denied any involvement, explaining his movements by saying he had been waiting on Orchard Street for an estimate for work on his car, had noticed Boklan's unmarked police car engaged in what looked like a stakeout, and had stayed around to see what was happening.

Gazzara contends that Secret Service Agents Boklan and Sulivan arrested him illegally, without warrant and without probable cause to believe that he was engaged in criminal activity. He further contends that a warrant to search his home issued several days after his arrest was based partially on information obtained as a result of his illegal arrest and the evidence found there must therefore be suppressed. *See Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Gazzara claims his conduct on the morning of May 19, in "lawfully operating his motor vehicle on the public road," was "innocuous in nature and susceptible of innocent as well as culpable interpretation," Gazzara Memorandum at 1, 4, and contends that the information available to the agents at the time of arrest was too ambiguous to form the basis for a warrantless arrest.

■ The agents had no warrant to arrest Gazzara, but the arrest was based on probable cause. The information that contributed to the arresting agents' perception of probable cause came from three main sources: (1) direct observations of the agents who were monitoring street activity near Charlie's Meats; (2) a tip provided earlier in the investigation by a confidential informant who told federal agents that Joseph Gazzara was involved in a counterfeiting scheme and had purchased or was about to purchase $10,000 worth of ink for printing counterfeit currency; and (3) information independently corroborated or newly uncovered in verifying the informant's tip, including a photo of Joseph Gazzara, and the facts that he lived at 6 Christine Drive in Spring Valley, New York, that two years earlier he had been charged with second degree murder before a Rockland County grand jury that refused to indict, and that he had been identified by New York State Police as a "known associate" of parties connected with passing counterfeit bills. (Tr. A 104–117) Gazzara challenges the informant's tip as bearing insufficient "indicia of reliability" to be accorded any weight in the agents' evaluation of probable cause. *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 2330, 76 L.Ed.2d 527 (1983). The information the agents had independently verified or uncovered and "the corroborative nature of events which the agents themselves observed," *United States v. Tucker*, 380 F.2d 206, 212 (2d

Cir.1967), were sufficient even absent the confidential informant's tip to give the agents probable cause to believe that Gazzara was "acting as a lookout and was involved in a counter surveillance, and was covering [the] counterfeit deal ... that was taking place there." (Agent Boklan, Tr. 107)

The Supreme Court has recently reaffirmed, in jettisoning the two-pronged *Aguilar* test for evaluating credibility of informants' statements, that probable cause determinations in whatever context turn on an evaluation of "the totality of the circumstances." *Gates*, 103 S.Ct. at 2332, *citing Brinegar v. United States*, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1948), *and Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). The facts "are not to be dissected and viewed singly [but] must be considered as a whole." *United States v. Oates*, 560 F.2d 45, 61 (2d Cir.1977) (quoting *United States v. Magda*, 547 F.2d 756, 758 (2d Cir.1976), (quoting *United States v. Hall*, 525 F.2d 857, 859 (D.C.Cir.1976)). Moreover, "probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Gates*, 103 S.Ct. at 2335 n. 13. The passage of time has not diminished the force of Learned Hand's observation that "the 'reasonable cause' necessary to support an arrest cannot demand the same strictness of proof as the accused's guilt upon trial, unless the powers of peace officers are to be so cut down that they cannot perform their duties." *United States v. Heitner*, 149 F.2d 105, 106 (2d Cir.1945).

Courts have widely recognized that "seemingly innocent activity [may become] suspicious in light of [corollary information]." *Gates*, 103 S.Ct. at 2335 n. 13 (quoting unpublished dissent of Illinois Supreme Court Justice Moran); *United States v. Webb*, 623 F.2d 758, 761–62 (2d Cir.1980); *United States v. Canieso*, 470 F.2d 1224 (2d Cir.1972) (Friendly, C.J.); *Heitner*, 149 F.2d at 106. Nowhere is this observation more apt than in the case of an individual suspected of acting as a lookout at a place where a crime is known to be in progress, a criminal activity whose only visible signs are the ordinarily innocent acts of waiting and watching.

Above all, "probable cause deals 'with probabilities. These are not technical; they are the factual and practical considerations of everyday life,' " *Gates* at 2333 (quoting *Brinegar*, 338 U.S. at 175, 69 S.Ct. at 1310), "weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement," *id.* at 2328 (quoting *United States v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981) (border stop and search)). Whether the facts available to the arresting officers were "sufficient to warrant a prudent man in believing that the petitioner had committed ... an offense," *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964), must be assessed "on the basis of the collective knowledge of the police rather than on that of the arresting officer alone," *United States ex rel. La Belle v. La Vallee*, 517 F.2d 750, 753 (2d Cir.1975), *cert. denied*, 423 U.S. 1062, 96 S.Ct. 803, 46 L.Ed.2d 655 (1976); *see Canieso*, 470 F.2d at 1230 n. 7.

In Gazzara's case, even discounting the uncorroborated element in the informant's tip—that Gazzara was active in a counterfeiting operation and had purchased large quantities of ink—the totality of the circumstances provided probable cause to effect a warrantless arrest. The agents did not merely suspect but knew for a certainty that a violation of federal counterfeiting statutes was in progress. *See United States v. Webb*, 623 F.2d 758, 762 (2d Cir. 1980). *Compare Draper v. United States*, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959); *United States v. Canieso*, 470 F.2d at 1226–29. They knew that Bohn, a key participant, claimed to have two confederates at the scene. One they had already identified as the occupant of a van near the basement door; the other was a man waiting "out there" or "out front" to ensure delivery and payment. The agents had observed a man sitting in a parked car posi-

tioned to monitor their activities who appeared to be watching the area. They knew that man to be Joseph Gazzara, since both his face and his license plate matched information obtained from local law enforcement agencies in verifying the informant's tip. *Compare Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1978) (no certainty that suspect was the "Irving" identified in tip); *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) (no indication that the individual arrested was the same Mr. Toy implicated by the informant's tip).

■ Information obtained in the course of a pre-arrest investigation may include hearsay and police reports of prior brushes with the law. The elements of a probable cause determination need not meet the stringent standards for evidence competent to prove guilt at trial. *See, e.g., Jones*, 362 U.S. at 270–71, 80 S.Ct. at 735–36 ("that petitioner was a known user of narcotics made the [informant's] charge against him [of selling heroin] much less subject to scepticism than would be such a charge against one without such a history"); *Brinegar*, 338 U.S. at 173, 69 S.Ct. at 1309 (quanta and modes of proof differ in determining guilt and probable cause to arrest); *Tucker*, 380 F.2d at 211; *Heitner*, 149 F.2d at 107. The agents were not barred from factoring into the probable cause equation what they already knew of Gazzara's past activities: that he had been wounded three years before in a drug related shotgun shoot-out that left one man dead and another seriously wounded (Tr. 104–117; Def. Ex. to Gazzara Memorandum), and that he was a known associate of parties involved in passing counterfeit bills. Gazzara's behavior, although innocent of itself, was when observed in context strongly corroborative of the agents' "particularized suspicion," *Cortez*, 449 U.S. at 418, 101 S.Ct. at 695, that Gazzara was the man Bohn had identified as his partner "out there." *See Webb*, 623 F.2d at 762–63.

■ A conclusion of probable cause need not be infallible but need only prudently evaluate the probabilities. Given the totality of circumstances described above, the probability that an innocent errand had brought Mr. Gazzara from Spring Valley to Main Street, Nanuet, between 10:30 and 11:15 on May 19, the time and place appointed for the illegal transactions, was low. The probability that an innocent explanation existed for his suspicious conduct, strongly suggestive of counter surveillance, was lower still. His brief stop at the autobody shop, although tending and perhaps designed to alleviate suspicion, was fully consistent with a purpose of avoiding detection while still monitoring activity around Charlie's Meats. Any lack of interest in the deal was belied by Gazzara's immediate reapparance on Main Street and his twenty minute wait within sight of the butcher shop—during which Gazzara himself admitted he was actively watching the stakeout. A prudent law enforcement officer experienced in surveillance of undercover operations could reasonably interpret these facts as providing a "reasonable, objective basis for belief" in Gazzara's complicity. *Webb*, 623 F.2d at 761. This is true even when no weight is accorded to the uncorroborated portion of the informant's tip. The information the agents had obtained independently of the tip, "coupled with the observed conduct of [the defendant], gave them 'reasonable cause' to make the arrest." *Heitner*, 149 F.2d at 107.

But the law does not demand so rigid a division between potentially unreliable information acquired from informants and other information uncovered in an investigation. As then Chief Judge Friendly commented in an opinion that foreshadowed adoption of the test in *Gates*, "when a [constitutionally unreliable tip] has generated police investigation and this has developed significant corroboration or other 'probative indications of criminal activity along the lines suggested by the informant,' . . . [it] may be used to give such additional color as is needed to elevate the information acquired by police observation

above the floor required for probable cause." *Canieso*, 470 F.2d at 1231 (citations omitted).

■ The cases, even before *Gates*, distinguished between the quantum of reliability needed when a confidential informant's tip forms the sole basis for a finding of probable cause and when probable cause is grounded in independent observation of the suspect that tends to corroborate the tip. *Compare Jones*, 362 U.S. at 269–70, 80 S.Ct. at 735 *and Beck v. Ohio*, 379 U.S. 89, 97, 85 S.Ct. 223, 228, 13 L.Ed.2d 142 (1964) *with Gates*, 103 S.Ct. at 2334–35. *Cf. Tucker*, 380 F.2d at 212 (requiring disclosure of the informant's identity only where the tip forms the bulk or core of probable cause). Nor is there reason to hold that the agents were required to treat this particular tip as inherently unreliable. A sealed affidavit makes clear that, although the tip was double hearsay, the source identified is uniquely in a position to have access to the information provided. *See Gates*, 103 S.Ct. at 2335. " '[C]orroboration through other sources of information reduce[s] the chances of a reckless or prevaricating tale,' thus providing 'a substantial basis for crediting hearsay.' " *Id.* (quoting *Jones*, 362 U.S. at 269, 271, 80 S.Ct. at 735, 736). The agents had corroborated every detail of the tip save the purchase of the counterfeiting ink, and administered a polygraph test to the informant that indicated he was speaking truthfully. Boklan Affidavit (Submitted Under Seal). Applying the totality-of-circumstances analysis dictated by *Gates*, the agents were justified in relying on the informant's tip at the very least to color their evaluation of probable cause, and their independent investigations and observations sufficiently corroborated Gazzara's involvement in the counterfeiting scheme to justify his warrantless arrest near the scene of the crime. *See Newcomb v. United States*, 327 F.2d 649 (9th Cir.1964) (warrantless arrest of suspected counterfeiter justified because of danger of flight). The arrest was legal. Therefore, no basis exists for suppressing Gazzara's statements or a lawn mower—allegedly purchased by Gazzara in a box later used to hold counterfeiting materials—found at Gazzara's home pursuant to a search warrant. In any event, the doctrine of "inevitable discovery" prevents suppression even assuming probable cause was lacking, as the agents already knew or could easily have discovered all of the facts disclosed by Gazzara at the time of his arrest. *See United States v. Jarvis*, 560 F.2d 494 (2d Cir.1977); *United States v. Falley*, 489 F.2d 33 (2d Cir.1973).

## II. *Joseph Bohn*

Joseph Bohn was arrested just as he concluded his meeting with "Leo." Agents Lacey and Rohde entered Bohn's store by the front door at about 11:15 a.m. and found it empty except for Bohn's partner, Al Ponce, and a customer. They quickly searched the two men, handcuffed them, and placed them in the meat locker, as knives and cleavers were hanging within reach. Bohn walked in while this was taking place, and the agents placed him under arrest.

Rohde testified at the hearing that the agents took Bohn to a nearby desk, that Lacey read Bohn his *Miranda* rights from a card,· and that Bohn responded that he understood them and wished to cooperate. Rohde said that Bohn admitted he had acted as a middleman in setting up the sale of the counterfeit plates from "Ed" to "Leo." Rohde testified that Bohn agreed to sign a printed Consent to Search form, which was introduced in evidence. It lists Bohn's shop, van, and Chevy Nova, and Bohn's home address, which is entered in extra space provided above the signature line. Rohde testified that Bohn was asked to place his initials in the margin next to his home address to demonstrate that it had not been written in after the form was signed. The form notes the time as 11:34 a.m., less than twenty minutes after the agents first entered the shop. During the search of the shop's basement, the agents discovered several boxes containing counterfeiting plates and materials.

Bohn was taken to the Secret Service's White Plains office, where Rohde testified Bohn was again advised of his rights by Agent Scenna. Bohn then repeated the information he had given the agents earlier. At about 5:30 p.m., Bohn was taken to the Secret Service office in the World Trade Center. Bohn's statement was reduced to writing by Agent Lacey on a form that incorporated a printed version of the *Miranda* warning. As Bohn was preparing to sign the statement, his wife called the office in a state of extreme agitation. Agent Sullivan, who had gone to search Bohn's home, had indiscreetly revealed to Mrs. Bohn that the agents had been told that her husband was keeping a girl friend and natural daughter in a house he owned in Monticello, New York. According to Rohde, Bohn accused the agents of wrecking his marriage, and angrily refused to sign the statement.

Bohn's version of the events following his arrest differs radically from Rohde's. Bohn is fifty-six and emigrated to this country from Rumania as a young man. He has a high school education and speaks and understands English well. He claims he was never told he was under arrest or advised of his *Miranda* rights, and that he explicitly refused to grant permission for any search of his home. He claims he cannot read well without his glasses which he never takes to his shop and, although he admits that he signed the form and that the initials next to his home address appear to be his, he "draws a blank" as to how the initials got there and claims the agents did not tell him what he was signing. He confirms that he blamed the agents for his troubles with his wife but denies that this was the reason he refused to sign the statement he had dictated to Lacey. He claims that, when his written statement was read aloud at his request, he heard the *Miranda* warning for the first time and for the first time realized that he could have had an attorney present during questioning. He also claims the agents refused to provide him with food and medicine when requested, and that his statements were the result of unnecessary pre-arraignment delay.

Mr. Ponce, part owner of the butcher shop, partially corroborates Bohn's story. He testified that he was familiar with the substance of a *Miranda* warning and did not hear the agents read any such warning to Bohn. He said he heard Bohn exclaim, "You got me" at the moment of his arrest and later agree to tell the agents anything he could. Ponce stated that after he had been placed inside the meat locker he went to a small window to watch and could hear "almost everything." Regarding the Consent to Search form, Ponce believed that the agents told Bohn it was "to search the store," but testified that he could not remember exactly.

■ The government must prove by a preponderance of the evidence that Bohn consented to waive his Fifth Amendment rights knowingly and voluntarily. *Miranda v. Arizona*, 384 U.S. 436, 475, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694 (1966). Voluntariness is not at issue, since no one—including Bohn—disputes that Bohn sincerely wished to cooperate with the authorities. Virtually all of the information he was to provide was volunteered within the first fifteen minutes after his arrest. The issue is whether he was properly advised of and knowingly waived his rights. Bohn's testimony, however, was at times evasive and at times overly assertive, whereas Agent Rohde was an essentially credible witness. Rohde changed his testimony as to the number of times Bohn was read his rights, but this was consistent with Rohde's tendency, apparent also in his testimony regarding the exact times at which he sighted Gazzara, to be initially hazy on details. Rohde appeared to be making a good faith effort to pin down the exact sequence of events and he volunteered the correction: "reflecting on what I said before, I think I incorrectly said he was advised of his rights twice, in the meat market, it was really only once." (Tr. 296). Bohn, citing *United States v. Williams*, 459 F.2d 903, 907 (2d Cir.1972), argues that in the absence of "direct" testimony, the court may

not rely on Agent Rohde's "hearsay" account. The point is not well taken. Agent Rohde's testimony is not hearsay since he was present and participated in the events he is describing. Among the events he witnessed were Lacey's and Scenna's reading of Bohn's *Miranda* rights.

■ The probative value of Ponce's testimony is undercut by his bias in favor of his friend and business partner of five years. He admitted on cross that he had at times lied to protect Bohn. His position in the meat locker seems unlikely to have permitted him to see and hear "everything," as he claimed, and he may have missed some of the action while he was being escorted to the meat locker. Bohn in his posthearing memorandum contends that the meat locker's acoustics were excellent and in fact moved to reopen the hearing in order to conduct sound tests there. This motion is denied, since the issue of fact to be determined here is not how well an expert could hear from inside the locker, but how carefully Ponce was able to follow, how clearly he recalls the agents words to Bohn amid the confusion of that morning's events in the butcher shop, and whether he was truthful. Although Ponce answered "No" or "Yes" to a number of pointedly leading questions on direct concerning whether he could hear and what he heard, his vague responses to more generalized questioning indicate that he either was not able to follow or cannot now recall with precision everything that was said to Bohn by the agents at his arrest.

■ Finally, it seems unlikely that arresting agents would take the trouble to explain and have Bohn sign a Consent to Search form and yet neglect the more fundamental procedure of reading the suspect his *Miranda* rights. The government has shown by a preponderance of the evidence that Bohn was advised of his rights; as owner of his own business and an intelligent and mature person he was capable of understanding and knowingly waiving his rights. He knowingly waived his rights and agreed to tell the agents whatever he could, because he had been caught red-handed and wanted the authorities to know his role had been relatively minor. Any claimed arraignment delay or physical deprivation has no bearing on the suppression issue since neither delay nor deprivation contributed to Bohn's confession, which clearly was voluntary and was rendered within minutes of his arrest. *See United States v. Rubio*, 709 F.2d 146, 153–54 (2d Cir.1983); *United States v. Burgos*, 579 F.2d 747, 749–50 (2d Cir.1978).

### III. *Edward Stanard*

At the moment of Bohn's arrest agents were moving in on the accomplice he had identified as "Ed," waiting in a van in back of the butcher shop. After his arrest Edward Stanard was taken to the White Plains office for interrogation and later to the Secret Service office in the World Trade Center. Edward Stanard is 37 years old, attended two years of college, and was employed for twelve years as a supervisor in a brokerage firm before joining a messenger service in Rockland County. He claims the agents who interrogated him never informed him of his constitutional rights, and questioned him incessantly even after he had invoked his right to counsel. He also claims the agents played upon his precarious emotional state and intimidated him into making incriminating statements without benefit of counsel, even though they knew that his brother Robert's attorney was on her way to the office. Attorney Julia Heit, counsel to codefendant Robert Stanard, took the stand at the suppression hearing, after full allocutions from both Edward and Robert concerning the potential conflicts of interest and dangers inherent in an attorney appearing as a witness. She testified concerning her recollection of events on the afternoon and night of May 19 when she was briefly serving as Edward Stanard's counsel.

Much of the testimony of Heit and Stanard is disputed by Agents Rohde, Marinzel, and Malfi. The agents assert that Edward Stanard was repeatedly informed of his rights and voluntarily and knowingly waived them at the time he made his state-

ments, that he was permitted to contact an attorney as soon as he asked to do so, that he showed no unusual emotional distress during the interviews, and that he spontaneously initiated the conversation during which he made incriminating statements prior to the arrival of his attorney because he believed he would benefit through cooperating with the authorities. They contend that he repeated the statements at issue in the presence of his attorney, and they suggest that Heit prevented him from disclosing any further details because she feared he would incriminate his brother Robert Stanard, who had been her client in previous criminal matters and who had retained her to act on Edward's behalf on the evening of Edward's arrest. What really happened is difficult to know, but the following narrative represents the most likely version of the relevant events, based on a consideration of the witnesses' demeanor and credibility, and the apparent consistency and accuracy of their recollections.

Edward Stanard was brought to the White Plains office sometime in the early afternoon. Agent Rohde advised him of his *Miranda* rights, which Stanard said he understood; although Stanard indicated he had no objection to being questioned he denied having any information concerning the counterfeiting operation. (Tr. 145–47) In response to a question from Agent Rohde, he admitted having been a customer in Bohn's butcher shop and stated that he had "heard of" Gazzara. After Rohde, who was supervising several concurrent interviews, left the room, Agent Marinzel continued the interrogation. He warned Stanard that he was in big trouble, that he faced a possible fifteen year sentence, and advised him to cooperate in locating the counterfeit money and identifying the other conspirators. Marinzel explained that any cooperation would be fully noted by the judge at sentencing. (Tr. 413–14)

Up until this moment, Stanard had not invoked his right to have an attorney present. Agent Marinzel testified that "[a]t one point, when I tried to stress again that I really would like him to cooperate with me, he said, 'well, how about if I call an attorney?'" (Tr. 148). Stanard telephoned an attorney whose business card he happened to have with him but was unable to make contact and said he would try again later. Marinzel testified that "after that we continued to talk, and I was continuing to ask him if he would cooperate with us, and still at this point he was saying, you know, he really couldn't do that." (Tr. 149). About ten minutes after the abortive call to his attorney Stanard's seventy-four year old mother telephoned and he was permitted to speak with her. She told Stanard that Secret Service Agents had come to her home, the address provided by Stanard at his arrest, and she urged her son to cooperate. He was upset after this conversation but made no statements in its aftermath that could be attributed to being overborne by emotion.

About twenty minutes after this call Agent Malfi called from the Secret Service's Manhattan office stating that someone identifying herself as Julia Heit had called there, representing that she would act as Edward Stanard's attorney. Marinzel advised Malfi that Edward Stanard wanted to cooperate and had indicated he would be ready to do so as soon as he got an attorney. Stanard confirmed that he knew Heit. Malfi then called her back and arranged to call again at her Manhattan home as soon as Stanard arrived at the World Trade Center, so that she could meet with her client. Heit did not ask to speak to Stanard at that time. She instructed Malfi not to talk to her client until she saw him, however, and Malfi responded "we can talk to him, and he has every right to talk to us." (Tr. 448) Malfi did not convey Heit's instruction to Marinzel in White Plains, but no further questioning occurred after Malfi's phone call because Marinzel's attention was occupied with the logistics of arranging for cars and agents to accompany the suspects and witnesses to New York. (Tr. 183–84) Stanard made no incriminating statements of any sort from the time he requested an attorney to the time he arrived in the Manhattan field office.

Malfi telephoned Heit when Stanard was about ten minutes from the Manhattan office and told her she could come and meet him. The group from White Plains arrived in the Manhattan office around 6:30 p.m., and Marinzel took Stanard to a small interview room containing two chairs and a table where they were joined by Malfi. Malfi introduced himself and informed Stanard that his attorney was on her way and would be arriving shortly. He reiterated what Marinzel had said earlier, that the charge against Stanard was serious, and that the government was interested in his cooperation. He added "when your attorney comes down, speak with her and we will see what we can do." (Tr. A 170)

As Malfi turned to leave the room both agents agree that Stanard asked "Well, what do you want to know about the operation?" or words to that effect. (Tr. 151, Tr. A 170) At this point Marinzel readvised Stanard of his rights and Stanard indicated he understood them and that he would be willing to speak in generalities but did not wish to get down to specifics until his attorney was present. (Tr. 186–87) Stanard asked what the agents could do for him if he helped them out and Malfi replied there was no way to know until they found out what Stanard could do for them. Stanard volunteered that he knew of a box of counterfeit money and some negatives used for printing currency and indicated that although he did not know the current location of these items he could be instrumental in recovering them through an intermediary. Stanard at first refused to respond to Marinzel's suggestion that this intermediary was his brother Robert, but when pressed admitted Robert might know where to find the money and then exclaimed, "How can I hand up my brother? It's a hard thing for me to do." (Tr. 154)

About half an hour after Stanard and Marinzel reached the field office, Julia Heit arrived. She spoke privately to Stanard for about twenty minutes. She described him as sweaty, agitated, and conversing in "tearful tones" (Tr. 452), an evaluation that does not diverge significantly from Malfi's description of Stanard as nervous and con-

cerned. (Tr. A 201) When Malfi and Marinzel rejoined Stanard and Heit the four began a free floating discussion touching on the information Edward had already given, the merits of his cooperating, and what could be done to prevent the outstanding counterfeit bills from reaching the street. While the witnesses recalled the discussion somewhat differently, no improper pressure was in fact exerted, though the agents were eager to obtain the cooperation that had seemed highly likely prior to Ms. Heit's arrival. At one point Ms. Heit volunteered to act as a go-between in retrieving the box of money. She testified, nevertheless, that she felt that it would have been a breach of professional ethics to allow Edward to cooperate while still affected by the emotional stress of an arrest, particularly since she did not intend to continue representing him. She also was unable to obtain a concrete offer from the agents, beyond their promise to let Edward go home for the night if he told them where the box of counterfeit bills was located. At no point, however, did she ask to speak with an Assistant United States Attorney to explore formal plea negotiations.

The agents soon began to suspect that Heit would advise Edward not to cooperate, and they formed a belief that her advice stemmed from a desire to protect Robert Stanard, who had been her client in the past. Agent Malfi accompanied her to dinner, in part because he thought she might telephone Robert Stanard. Both after dinner and later in the evening Heit left Malfi, however, to make phone calls. During her last absence, the agents asked Edward how well he knew Heit and he said something that indicated to them that she was a "girl friend" of his brother. (Tr. 164, Tr. A 183) Malfi then remarked, "That should ring a bell in your head" (Tr. A 184), and Marinzel said something like, "Maybe you should really start considering, if your attorney is a girl friend of your brother, who she is actually looking out for: you or him." (Tr. 164) When Heit learned of this exchange upon her return she became irate at what

she viewed as interference with the attorney/client relationship. Shortly afterwards she left, instructing Edward not to speak with the agents and vice versa. No further questioning took place. The agents' suspicions of Heit's motives appear to have caused them to overreact near the end of the interview, but they neither coerced nor badgered Edward, either before or after Heit's arrival, or engaged in "threats, promises or inducements to talk," *Oregon v. Bradshaw,* —— U.S. ——, 103 S.Ct. 2830, 2835, 77 L.Ed.2d 405 (1983) (plurality opinion of Rehnquist, J.) (quoting 54 Or.App. 949, 952, 636 P.2d 1011, 1012 (1981)), beyond the proper inducements inherent in informing him of the gravity of his situation and the advantages to be gained from cooperating. *See, e.g., United States v. Drummond,* 354 F.2d 132, 144, 149 (2d Cir.1965) (*en banc*), *cert. denied,* 384 U.S. 1013, 86 S.Ct. 1968, 16 L.Ed.2d 1031 (1966); *United States v. Springer,* 460 F.2d 1344, 1347 (7th Cir.1972).

Edward Stanard claims violations of both his Sixth Amendment right to representation by counsel during a criminal prosecution and his Fifth Amendment right to have counsel present during interrogation. The Sixth Amendment claim seems dubious, since Stanard had not yet even been charged. *See Kirby v. Illinois,* 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (plurality opinion of Stewart, J.) (Sixth Amendment attaches when criminal prosecution is initiated); *United States v. Guido,* 704 F.2d 675, 676 (2d Cir.1983); *United States v. Duvall,* 537 F.2d 15, 20–22 (2d Cir.), *cert. denied,* 426 U.S. 950, 96 S.Ct. 3173, 49 L.Ed.2d 1188 (1976). *Cf. Brewer v. Williams,* 430 U.S. 387, 398, 97 S.Ct. 1232, 1239, 51 L.Ed.2d 424 (1977). Moreover, the agents complied with Stanard's request for counsel and actively facilitated their meeting. *Compare Escobedo v. Illinois,* 378 U.S. 478, 485, 84 S.Ct. 1758, 1762, 12 L.Ed.2d 977 (1964). *See generally* Kamisar, *Brewer v. Williams, Massiah and Miranda: What is Interrogation? When does it Matter?,* 67 Geo.L.J. 1, 91–92 .n. 537 (1978). The Supreme Court, however, has recognized a right under the Fifth Amendment to re-quest that counsel be present during custodial interrogation, as a safeguard of the accused's right to remain silent. *See Edwards v. Arizona,* 451 U.S. 477, 485, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378 (1981); *see also Solem v. Stumes,* —— U.S. ——, 104 S.Ct. 1338, 1343 (1984); *Rhode Island v. Innis,* 446 U.S. 291, 298–99, 100 S.Ct. 1682, 1688,.64 L.Ed.2d 297 (1980). "If the individual states that he wants an attorney, the interrogation must cease until an attorney is present." *Miranda v. Arizona,* 384 U.S. 436, 474, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694 (1966). Here Stanard requested an attorney, and then accepted the services of one who called, so further interrogation would have been improper. Stanard's remark, "Well, how about if I call an attorney," followed by efforts to contact a lawyer, is a sufficient invocation. *See United States v. Rodriguez-Gastelum,* 569 F.2d 482, 486 (9th Cir.) (*en banc*) ("Okay, okay, but with an attorney" held sufficient invocation), *cert. denied,* 436 U.S. 919, 98 S.Ct. 2266, 56 L.Ed.2d 760 (1978).

■ The government argues, however, that Stanard waived his right to have an attorney present by initiating further discussion with the agents though fully aware that he could have waited a short time and had his attorney present. A suspect may change his mind and validly waive his right to have counsel present even after invoking it. Until the decision in *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), the test for a waiver of the right to counsel was "whether, as an individual, case-by-case matter, a waiver of the right to counsel had been knowing, voluntary, and intelligent." *Solem,* 52 U.S.L.W. at 4309, *citing Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). In *Edwards* the Court adopted a "bright-line", "prophylactic rule, designed to protect an accused in custody from being badgered by police officers." *Solem,* —— U.S. at ——, 104 S.Ct. at 1343; *Oregon v. Bradshaw,* 103 S.Ct. at 2834 (plurality opinion of Rehnquist, J.). *Edwards* held that "an accused, . . . having expressed his desire to deal with the police only through counsel, is

not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." 451 U.S. at 484–85, 101 S.Ct. at 1884–85.

The Court's opinions construing *Edwards* employ a two-step analysis. *See Oregon v. Bradshaw*, 103 S.Ct. at 2835 (plurality opinion of Rehnquist, J.); *id.* at 2836 (Powell, J., concurring in the judgment); *id.* at 2840 n. 2 (Marshall, J., dissenting). First, it must be shown that communication regarding the investigation was initiated by the accused and was not a response to interrogation, defined as "any words or action ... that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. at 301, 100 S.Ct. at 1689. Second, the ensuing communication will rarely be entirely one-sided and to the extent the suspect's remark precipitates renewed interrogation, the question remains whether the suspect's waiver of his right to counsel during questioning "was knowing and intelligent and found to be so under the totality of the circumstances, including the necessary fact that the accused, not the police, reopened the dialogue with the authorities." *Oregon v. Bradshaw*, 103 S.Ct. at 2834 (plurality opinion of Rehnquist, J.) (quoting *Edwards*, 451 U.S. at 486 n. 9, 101 S.Ct. at 1885); *see id.* at 2840 n. 2 (Marshall, J., dissenting); *Wyrick v. Fields*, 459 U.S. 42, 46, 103 S.Ct. 394, 395, 74 L.Ed.2d 214 (1982) (*per curiam*) (quoting *Edwards*, 451 U.S. at 486 n. 9, 101 S.Ct. at 1885).

■ The evidence at the hearing establishes on balance that Stanard initiated the interrogation that resulted in the statements he seeks to suppress. Some "talking" took place at the White Plains office between Marinzel and Stanard after he had asked for a lawyer, but those discussions did not amount to interrogation and resulted in no incriminating statements. From the time Agent Malfi called the White Plains office concerning Julia Heit, no interrogation took place; by all accounts the ride into New York was uneventful. The subject of the investigation was next raised when Agent Malfi entered the interview room in New York City. He told Stanard that his attorney was on her way, and recommended to Stanard that he talk with her about cooperating. This statement was neither designed nor reasonably likely to elicit an incriminating response, within the meaning of *Innis*, since the response Malfi sought at that point was Stanard's cooperation *after* counsel had appeared. But as Malfi turned to leave the room Stanard spoke up, asking what exactly the agents wanted to know, and then offering to discuss the case but only in generalities.

■ Ms. Heit's instruction to the agents not to "talk" to her client could not preclude Stanard from waiving his right to her presence under the rule in this Circuit. *See United States v. Massiah*, 307 F.2d 62 (2d Cir.1962), *rev'd on other grounds*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964); *Cf. Brewer*, 430 U.S. at 405, 97 S.Ct. at 1242 (dictum) (eschewing position that a defendant could not, without notice to counsel, waive his right to counsel); *Guido*, 704 F.2d at 678 (declining to apply New York rule prohibiting uncounseled waivers to waiver of Fifth amendment right to an attorney). *Compare United States v. Thomas*, 474 F.2d 110 (10th Cir.), *cert. denied*, 412 U.S. 932, 93 S.Ct. 2758, 37 L.Ed.2d 160 (1973) (*per se* rule excluding waiver outside counsel's presence); *People v. Hobson*, 39 N.Y.2d 479, 484–85, 384 N.Y. S.2d 419, 422–23, 348 N.E.2d 894 (1976) (New York rule prohibiting uncounseled waiver). The Fifth Amendment prohibits interrogation but not routine communication, and it does not bar the acceptance of a voluntary confession. *See Bradshaw*, 103 S.Ct. at 2835 (plurality opinion of Rehnquist, J.); *id.* at 2837 (Powell, J., concurring in the judgment); *Michigan v. Mosley*, 423 U.S. 96, 102, 96 S.Ct. 321, 325, 46 L.Ed.2d 313 (1975).

The cases cited by defendant invalidating contacts against counsel's express instructions implicate defendant's Sixth Amendment right to counsel or involved active

interrogation initiated by the authorities, and not spontaneous communications volunteered by the accused. *See, e.g., United States ex rel. Magoon v. Reincke*, 416 F.2d 69, 70–71 (2d Cir.1969) (relying on Sixth Amendment rights under *Escobedo* ), *aff'g* 304 F.Supp. 1014, 1017 (D.Conn.1968); *Taylor v. Elliot*, 458 F.2d 979, 980–81 (5th Cir.) (interrogation during extradition implicating Sixth Amendment rights), *cert. denied*, 409 U.S. 885, 93 S.Ct. 117, 34 L.Ed.2d 142 (1972); *United States v. Wedra*, 343 F.Supp. 1183, 1184–87 (S.D.N.Y.1972) (Weinfeld, J.) (post-indictment interrogation implicating Sixth Amendment rights); *United States v. Lilla*, 534 F.Supp. 1247, 1279–80 (N.D.N.Y.1982) (custodial interrogation implicating Fifth Amendment rights); *id.* at 1280–81 (grand jury proceedings in "accusatory" phase implicating Sixth Amendment rights); *United States v. Miller*, 432 F.Supp. 382, 385–89 (E.D.N.Y.1977) (Sixth Amendment implicated where requests for counsel repeatedly denied); *id.* at 390 (following *Magoon* as to Fifth Amendment rights); *United States v. Howard*, 426 F.Supp. 1067, 1071–72 (W.D.N.Y.1977) (following *Magoon* upon finding of gross interference with attorney/client relationship). The only cited case directly on point, involving a pre-arraignment statement voluntarily offered by the accused after counsel had telephoned instructions to the authorities not to speak with the suspect, relied heavily on the pre-*Kirby* view that Sixth Amendment rights attach as soon as suspicion begins to focus on the suspect. *See Magoon*, 304 F.Supp. at 1017. *Compare Escobedo v. Illinois*, 378 U.S. 478, 485, 84 S.Ct. 1758, 1762, 12 L.Ed.2d 977 (1965), *with Kirby v. Illinois*, 406 U.S. 682, 688, 92 S.Ct. 1877, 1881, 32 L.Ed.2d 411 (1972) (plurality opinion of Stewart, J.).

Whether talking amounts to interrogation is a question of fact. The law is clear, however, that discussing the investigation in the accused's presence, or imparting information relevant to his custody or the evidence against him, is not interrogation unless it is "reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S. at 302–03, 100 S.Ct. at 1690. The Second Circuit has recently held that a discussion of cooperation is not "inherently a form of questioning for purposes of *Miranda*," observing that "[w]hile the agents did suggest that [defendant] cooperate in the investigation, they apparently also told him he should discuss this possibility with his attorney." *Guido*, 704 F.2d at 677.

The record also establishes that, before further interrogation occurred, Stanard knowingly and voluntarily waived his Fifth Amendment rights. When Stanard offered to answer the agents' questions, Marinzel reminded Stanard of his *Miranda* rights. Stanard responded that he understood his rights and was willing to speak in generalities but did not want to get down to specifics before his attorney arrived. Stanard understood his right to counsel. He felt at the time a strong inclination to cooperate, having been "arrested red-handed on the spot." (Tr. 404) He must also have suspected that Bohn, whom he knew was in custody, might talk. He is a sophisticated adult, having attended college and been employed in various responsible positions. He was familiar with an arrestee's rights, and aware that cooperation might result in a lighter sentence. He was torn between loyalty to his brother and concern for his own welfare. (Tr. 411–16) Stanard knew that an attorney could help him, and had the name of a lawyer ready at the time. He wanted counsel more for assistance in working out a deal, however, than for protection from coercion or help in establishing a defense. Thus, when told Ms. Heit was on her way he offered to speak in generalities to let the agents know what had to offer and that he would cooperate in more detail after speaking to his lawyer and working out a deal. *Miranda* was never intended to "deprive suspects of an opportunity to make informed and intelligent assessments of their interests." *Michigan v. Mosley*, 423 U.S. at 102, 96 S.Ct. at 326. The totality of these circumstances establishes that Edward voluntarily initiated and participated in the discussion because he had, intelligently and with

good reason, concluded that his interests would be served by timely cooperation and that he did not need an attorney's assistance to open the discussion. *Compare Miller*, 432 F.Supp. at 387 (holding right to counsel violated where accused's requests for counsel were repeatedly ignored during custodial interrogation and accused demonstrated a felt need for counsel's assistance). While Ms. Heit may have acted sincerely in later advising Stanard not to cooperate, her longstanding professional relationship with his brother created an appearance of a conflict of interest that leaves unresolved the question whether Edward Stanard's own reasoned judgment or Ms. Heit's advice better served his interests.

 Stanard's subsequent statements made in Ms. Heit's presence are also admissible at trial as they were made with benefit of counsel and did not constitute formal plea bargaining discussions protected under Federal Rule of Evidence 410. *See United States v. Lawson*, 683 F.2d 688, 691 (2d Cir.1982) (dictum); 2 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 410[01], at 410–2. The jury will have to decide what was actually said in that interview.

### IV. *Robert Stanard*

Robert Stanard's name surfaced when Gazzara admitted knowing Edward's brother Robert, a house painter. The officers' suspicions were further aroused when counterfeiting materials were discovered in Bohn's shop in boxes that had contained gallon cans of paint. On the evening of May 18, when Edward Stanard indicated that Robert might know where to locate the outstanding counterfeit currency, Secret Service agents had already begun to look for Robert. They found and spoke to Robert's eighteen-year old son, who directed them to the home of Barbara Viglietta in Congers, New York, a woman with whom Robert Stanard had a romantic relationship.

At about 11:45 p.m., Agents Sullivan and Boklan knocked on the door of Ms. Viglietta's home. She opened the door and, when the agents identified themselves, invited them in. The agents explained they were looking for Robert in connection with a counterfeiting operation and asked permission to enter and look around. (Tr. 638) Viglietta assented. When asked where Stanard slept, she showed the agents to a room in the basement. After a quick survey of the room to insure that Stanard was not inside, Agent Boklan radioed two agents stationed outside the house to join them. At this point Boklan asked for permission to search for "counterfeit money and evidence of a counterfeiting operation." (Tr. A 31, 86) He gave Ms. Viglietta a Consent to Search form which she read and signed. The agents searched the downstairs bedroom and found on a dresser an address book and a phone book belonging to Robert, which they leafed through and seized as possibly containing the names of other counterfeiters.

"When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given." *Bumper v. North Carolina*, 391 U.S. 543, 548, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797 (1968). Ms. Viglietta conceded that the agents searched no room without her permission. Although at the hearing she described one of the agents as "nasty," she testified that Agent Boklan, who obtained her permission for the search, was polite, never raised his voice, and never told her that she had to sign the form. No force was used or threatened, no gun was drawn, and the search proceeded so quietly that Ms. Viglietta's teenage children remained fast asleep in the upstairs bedroom. Although Ms. Viglietta recalled being nervous and in tears at the time she signed the form, she did not credibly rebut Boklan's testimony that she appeared concerned but not hysterical and was perfectly aware of what was going on. (Tr. 89A) Ms. Viglietta testified that Robert Stanard had told her earlier in the day that his brother Edward had been arrested for counterfeiting and that he, Robert, "knew about" the counterfeiting operation. (Tr. 634) Thus,

328

the agents' visit may not have been entirely unexpected.

■ Ms. Viglietta owns her own home and supports herself and her children as an insurance representative writing policies. The consent form is brief. It bears the heading in block capitals "CONSENT TO SEARCH," and reads, "I ___Barbara Viglietta___ have been informed of my constitutional right not to have a search made," and continues "I have also been informed of my right to refuse to consent to such a search." (Gov.Ex. 3) Ms. Viglietta's contention that she failed to read or understand the import of this brief form before signing it was not believable. Ms. Viglietta's consent to search was given voluntarily and in a spirit of cooperation, and was neither coerced nor granted in submission "to a claim [on the agents' part] of lawful authority." *Bumpers*, 391 U.S. at 549, 88 S.Ct. at 549, 88 S.Ct. at 1792; *see United States v. Calvente*, 722 F.2d 1019, 1023–24 (1983).

■ The seizure of address books belonging to Robert Stanard was within the scope of Ms. Viglietta's consent. Boklan orally requested consent to search for "evidence of counterfeiting operations" and she assented. Furthermore, the form Ms. Viglietta signed recites: "These (officers or agents) are authorized by me to take from the premises any letters, papers, materials or other property which is contraband or evidence in the nature of ___counterfeit currency___." (Gov.Ex. 3) When asked if she expected the agents to seize evidence besides currency, Ms. Viglietta replied evasively. (Tr. 629) Given the broad language of the form, the agents' discussions with Ms. Viglietta, and the fact that she at no time objected to seizure of the books, her consent extended to evidence of counterfeiting operations in the form of papers or books. The agents "were allowed to consider the evidentiary value of the items in the context in which they were seized." *United States v. Callabrass*, 607 F.2d 559, 564 (2d Cir.1979) (upholding seizure of notebooks as evidence of drug manufacturing operation and identity of occupants of

apartment), *cert. denied*, 446 U.S. 940, 100 S.Ct. 2163, 64 L.Ed.2d 794 (1980).

■ Ms. Viglietta had the capacity validly to consent to a search of the basement bedroom. "The well established rule in this Circuit is that '[c]onsent to a search by one with access to the area searched, and either common authority over it, a substantial interest in it or permission to exercise that access, express or implied, alone validates the search.'" *United States v. Buettner-Janusch*, 646 F.2d 759, 765 (2d Cir.1981) (quoting *United States v. Gradowski*, 502 F.2d 563, 564 (2d Cir.1974) (*per curiam*)). The home belonged to Ms. Viglietta. Robert had lived in the room from July 1981 to May 1982, apparently paying some rent. The room had no lock and no separate entrance, however, and Ms. Viglietta continued to enjoy access to the room. Robert retained a key to the Viglietta home, had left some of his belongings there, and still slept in the basement room on occasion. But he had moved to his own apartment and stopped paying rent a year before the search. Whether as a joint tenant, *see United States v. Matlock*, 415 U.S. 164, 169–72 & n. 7, 94 S.Ct. 988, 992–93, 39 L.Ed.2d 242 (1974), or as a host, *see United States v. Novick*, 450 F.2d 1111, 1112–13 (9th Cir.1971), Ms. Viglietta was capable of giving a valid consent to search Robert's room. Nor was the address book a specific item within the search area "surrounded by an independent privacy interest," requiring either a warrant or proof of an exception to the warrant requirement. *Buettner-Janusch*, 646 F.2d at 766. Even if Robert Stanard retained an expectation of privacy in the contents of the address and phone books, they were discovered in plain view and the agents could properly look through them to determine whether they were relevant to the conspiracy. *See United States v. Ochs*, 595 F.2d 1247, 1257–58 (2d Cir. 1979). Moreover, "under the plain view doctrine the incriminating nature of an object is generally deemed 'immediately apparent' where police have probable cause to believe it is evidence of a crime." *Id.* 595 F.2d at 1258 (quoting *Coolidge v. New*

*Hampshire,* 403 U.S. 443, 466, 91 S.Ct. 2022, 2038, 29 L.Ed.2d 564 (1971) (plurality portion of opinion of Stewart, J.)). The agents could reasonably conclude from their outward appearance that the address and appointment books would likely contain evidence of the counterfeiting conspiracy in which they had probable cause to believe Stanard was involved. *See Buettner-Jan-usch,* 646 F.2d at 767; *Callabrass,* 607 F.2d at 564.

Finally, Robert Stanard and Gazzara have moved to suppress introduction of witness identifications obtained by use of a photographic array. On June 16, 1983, a printing press repairman told Secret Service agents that he had recently repaired a printing press for a man named "Joe" in Spring Valley, New York. He described four people who were present at the house and said he could identify them. He was shown a series of fourteen photographs of different men, introduced in evidence at the hearing, which he looked at one at a time. He was instructed not to select one picture until he had looked at them all. He selected a photo of Joseph Gazzara as the owner of the house, and one of Robert Stanard as the man who paid for the repair of the press. He also correctly identified Steven Gazzara as "Joe's" son. Later, substantially the same photographic array and technique were employed in an interview with the owner of a printing supply business who identified Robert Stanard as "probably the individual" who had purchased an electric paper cutter in February 1983.

██ Defendants' contention that the array was impermissibly suggestive is without merit. The photos were presented in a neutral manner and they were sufficient in number. *See United States v. Marrero,* 705 F.2d 652, 655 n. 5 (2d Cir.1983) (an array of six photos is sufficient in number to avoid suggestiveness). About half of the photographs were of men with facial hair and about half were of clean-shaven men. Gazzara wears a moustache and Stanard is clean-shaven. The photographs were also within the permissible range of similarity. *See United States v. Bubar,* 567 F.2d 192, 198–99 (2d Cir.), *cert. denied,* 434 U.S. 872, 98 S.Ct. 217, 54 L.Ed.2d 151 (1977). The presence of facial hair in no way obscures the men's features, *see United States v. Harrison,* 460 F.2d 270, 271 (2d Cir.) (*per curiam* ), *cert. denied,* 409 U.S. 862, 93 S.Ct. 152, 34 L.Ed.2d 110 (1972), and the inclusion of photos showing bearded and moustachioed men was, in any case, appropriate given the number of photos in the array and the fact that some of the suspects had facial hair and others did not. *Compare United States v. Fernandez,* 456 F.2d 638, 641–42 (1972) (photograph of black suspect who had nearly white skin was shown with photographs of five dark-skinned black men). No ground exists for withholding these photographic identifications from the jury.

### V. *Motion to Sever*

██ Finally, the defendants' motions to sever are also denied. Defendants correctly point out that introduction of an unredacted inculpatory hearsay statement of a codefendant poses serious constitutional problems. *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). Limiting instructions may be insufficient to prevent prejudice if the statements are highly incriminating. *See United States v. Rubio,* 709 F.2d 146, 155 (2d Cir.1983). The government here has indicated, however, that it will consent to redact the statements of defendants Gazzara, Edward Stanard, and Joseph Bohn to delete any references by each declarant to his codefendants. "As long as the use of redaction can avoid the danger of casting adverse implications on nondeclarant defendants" it may effectively be used to avoid the necessity for separate trials. R. Cipes, I. Hall & M Waxner, 8 *Moore's Federal Practice* ¶ 14.04[2] at 14–82; *see United States v. Marin,* 669 F.2d 73, 83–84 (2d Cir.1982).

██ Redaction poses certain dangers. *See Bruton,* 391 U.S. at 143–44, 88 S.Ct. at 1631–32 (White, J., dissenting); 8 *Moore,* at 14–79–80. Even after excision of the incul-

patory references, the jury may still guess at the connection between "Mr. X" in the statement and a codefendant. *See United States ex rel. LaBelle v. Mancusi,* 404 F.2d 690 (2d Cir.1968). But *Bruton* does not forbid this sort of "contextual connection" as long as the damaging inferences stem from separate admissible evidence. *See United States v. Trudo,* 449 F.2d 649, 652–53 (2d Cir.1971), *cert. denied,* 405 U.S. 926, 92 S.Ct. 975, 30 L.Ed.2d 799 (1972) (dictum) (collecting cases); *United States ex rel. Nelson v. Follette,* 430 F.2d 1055, 1058 (2d Cir.1970), *cert. denied,* 401 U.S. 917, 91 S.Ct. 897, 27 L.Ed.2d 817 (1971) (jury could guess that defendant was the man at the bar in the redacted statement only because testimony of eye witnesses had placed him there); *accord United States v. Dady,* 536 F.2d 675 (6th Cir.1976). *Compare United States ex rel. Mascia v. Zelker,* 450 F.2d 166 (2d Cir.1971), *cert. denied,* 406 U.S. 959, 92 S.Ct. 2066, 32 L.Ed.2d 346 (1972) (prosecution excised name of defendant but improperly allowed identifying factor of a white Pontiac to remain unexcised and took pains repeatedly to point out that defendant owned a white Pontiac). While redaction may be insufficient to prevent prejudice where there is no direct evidence against a defendant, *see Close v. United States,* 450 F.2d 152 (4th Cir.1971), *cert. denied,* 405 U.S. 1068, 92 S.Ct. 1513, 31 L.Ed.2d 799 (1971), substantial independently admissible evidence apart from the inculpatory statements of their codefendants connects each of the movants with the counterfeiting conspiracy. The government intends to offer, among other evidence, pretrial identifications of Gazzara and Robert Stanard by the printing machine repairman and of Robert Stanard by the seller of the papercutter, and the testimony of the officers at the stakeout who arrested Edward Stanard and Gazzara, as well as defendant's own self-incriminating statements.

Reliance on redaction may also prejudice the trial if a witness testifying to an oral statement made to him by a defendant "inadvertently exceeds permissible limits." *Bruton,* 391 U.S. at 144, 88 S.Ct. at 1632

(White, J., dissenting). This danger here is minimal, however, as the witnesses are experienced law enforcement officers alerted to the critical importance of excising all prejudicial references. The government should take special care to prepare its witnesses to avoid references that violate the standards enunciated by the Second Circuit, and should submit a description of what each witness will relate was said by any defendant before the witness takes the stand to testify. *See Trudo,* 449 F.2d at 653. The charge will incorporate limiting instructions to insure that the jury understands that the statements of each defendant may be considered only with respect to the defendant who made them. *See Follette,* 430 F.2d at 1059.

For the reasons stated above, defendants' motions to suppress and to sever are hereby denied.

SO ORDERED.